**FINN et al. v. CHILDS CO.**

No. 147, Docket 21521.

United States Court of Appeals Second Circuit.

Argued Feb. 27, 1950.

Decided April 5, 1950.

Ben A. Matthews, of New York City (Harper & Matthews, Vincent P. Uihlein, and Cornelius D. Crowley, Jr., all of New York City, on the brief), for respondent-appellant.

George Zolotar, Special Counsel, Securities and Exchange Commission, of New York City (Roger S. Foster, General Counsel, David Ferber, of Washington, D. C., and Lawrence M. Greene, Special Counsel, Securities and Exchange Commission, of Philadelphia, Pa., Richard V. Bandler, of New York City, and C. Eugene Webb, of Washington, D. C.), for Securities and Exchange Commission.

Joseph Lorenz, of New York City (Lorenz, Finn & Lorenz, of New York City, on the brief), for trustee-appellee John F. X. Finn and appellee Lorenz, Finn & Lorenz.

William P. Palmer, of New York City (Root, Ballantine, Harlan, Bushby & Palmer, L. Robert Driver, Jr., and Adam Yarmolinsky, all of New York City, on the brief), for appellees Everett Frank and William S. Hernon.

Samuel Masia, of New York City (Archibald Palmer, of New York City, appellee pro se), for appellee Archibald Palmer.

Harold P. Seligson, of New York City (Marshall, Bratter, Seligson & Klein, of New York City, on the brief), for appellees Protective Committee for Debentures and Marshall, Bratter, Seligson & Klein.

Hoch Reid, of New York City (Ehrich, Royall, Wheeler & Holland and Ralph Royall, all of New York City, on the brief), for appellee Ehrich, Royall, Wheeler & Holland.

Karelsen, Karelsen & Rubin, of New York City, for appellee Bernard Reis and Co.

Abraham K. Weber, of New York City, appellee pro se.

Holmes, Rogers & Carpenter, of New York City (Charles P. Rogers and Oliver C. Carpenter, both of New York City, of counsel), for appellees Thompson Preferred Stockholders' Committee.

Hetkin, Jervis & Hetkin, of New York City (Alfred H. Hetkin and Herman Jervis, both of New York City, of counsel), appellees pro se.

Levin & Weintraub, of New York City (Benjamin Weintraub, of New York City, of counsel), for appellees New York Credit Men's Association and pro se.

Bergerman & Hourwich and Samuel A. Mehlman, both of New York City (Milton M. Bergerman, of New York City, of counsel), for appellees McMeekan Committee and Bergerman & Hourwich and Samuel A. Mehlman pro se.

Karelsen, Karelsen & Rubin and Paul J. Kern, all of New York City (Morton G. Rosenberg, of New York City, of counsel), for appellees Durrell Preferred Stockholders Committee and Karelsen, Karelsen & Rubin and Paul J. Kern pro se.

Weinstein & Levinson, of New York City (Frank Weinstein and Samuel J. Levinson, both of New York City, of counsel), appellees pro se.

Murphy, Block, Sullivan & Sawyer, of New York City (John Dwight Sullivan, of New York City, of counsel), for appellees Common Stockholders' Committee and Murphy, Block, Sullivan & Sawyer pro se.

Before CLARK, GOODRICH, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

On petitions of various parties the district court granted final allowances for counsel fees and expenses of $964,439.36 in the proceedings for the reorganization of Childs Company under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq. Acting upon leave granted by this court, Childs Company, the reorganized debtor, has appealed from awards amounting to $954,350; it asks no review of items allowed in reimbursement of expenses—$6,627.10—or of two other minor awards to the Indenture Trustee and its attorneys amounting to $4,462.26. It urges as to the items appealed from that the awards should not exceed $600,000; while the Securities and Exchange Commission, appearing by virtue of § 208 of the Act, 11 U.S.C.A. § 608, and taking the same position it took below, urges that these awards should not exceed $750,000.

The reorganization was commenced by voluntary petition on August 26, 1943, and completed by the consummation of a plan on March 31, 1948—a period of four years and seven months. The filing of the voluntary petition followed immediately upon the dismissal by the court of an involuntary petition which had been filed against it. See In re Childs Co., D.C.S.D.N.Y., 52 F. Supp. 89. The court appointed as trustee Mr. John F. X. Finn, well-known lawyer, author, and teacher; and he selected as his counsel his law firm of Lorenz, Finn & Lorenz upon the understanding that allowances would not be shared. The debtor had operated a chain of medium-priced restaurants, numbering 77 in 1943, and had made some unfortunate real estate acquisitions. The trustee was immediately active in securing modification of many burdensome leases of real estate and in the readjustment of mortgages and sales of property. Several of these matters have been heard upon appeal. 415 Fifth Ave. Co. v. Finn, 2 Cir., 146 F.2d 592, certiorari denied Finn v. 415 Fifth Ave. Co., 325 U.S. 856, 65 S.Ct. 1185, 89 L.Ed. 1976; Meighan v. Finn, 2 Cir., 146 F.2d 594, affirmed Finn v. Meighan, 325 U.S. 300, 65 S.Ct. 1147, 89 L.Ed. 1624; Finn v. 415 Fifth Ave. Co., 2 Cir., 153 F.2d 501, certiorari denied 415 Fifth Ave. Co. v. Finn, 328 U.S. 838, 66 S.Ct. 1014, 90 L.Ed. 1614; In re Childs Co., 2 Cir., 163 F.2d 379. The trustee also took action against former officers of the company, obtaining a settlement of certain of his claims and pressing to a lengthy trial an action (not yet decided) involving other claims. So far as concerns conflicts among creditors and various classes of security holders, the reorganization seems to have been unusually free of controversy. Because of high wartime earnings and these activities of the trustee it soon became apparent that all creditors would be paid in full with a substantial equity for the stockholders. Developing a satisfactory plan of reorganization was somewhat more troublesome. The first plan approved by the district court, a capitalization entirely of common stock, divided 76.7% to holders of old preferred stock and 23.3% to holders of the old common stock, was defeated by vote of the common stockholders. A subsequent plan, involving issuance of both preferred and common stock, with voting power divided roughly 75% to the old preferred, and 25% to the old common, stockholders, was approved by both classes and eventually consummated.

The value of the new company, as found by the district judge for purposes of both plans, was $9,980,000; this estimate was based on predicted future earnings, and the history of the company since reorganization suggests that it may have been unduly optimistic. The equity value shown on the trustee's books on the day of consummation, reflecting revaluation of assets made by court-appointed appraisers, was $6,001,762. Even this figure was more liberal than the valuation made by traders on the stock exchanges.

The claims for allowance of the twenty-four parties now before us totaled $1,417,300. The allowances as made included $182,500 to the trustee and $535,000 to his counsel, $85,500 to eleven different representatives of creditors, $104,350 to seven different representatives of preferred stockholders, and $47,000 to four different rep-

resentatives of common stockholders.[1] In addition to this total of $954,350 and the other small allowances noted above which are not under review there were other expenses incurred in the reorganization of $180,662.76, a grand total of $1,145,102.12 or more than 26% of the net income of $4,329,472 received during the reorganization. This was in addition to the salaries of the debtor's administrative and executive staff, retained in full by the trustee except for the one office of Chairman of the Board. The aggregate salaries of these officials ranged from $62,500 to $87,600 a year. In addition a special attorney handling labor problems was continued in the employ of the debtor at an annual retainer of $20,000. It may be noted that the amounts granted as allowances far exceed the trustee's estimate of the reorganization expenses in the two plans presented—$350,000 in the first plan and $400,000 in the plan finally confirmed—beyond interim allowances to him and his counsel which had reached $231,000 by the time of the latter plan.

The fixing of allowances has been called "the most thankless and delicate task in all of the problems of judicial reorganization," Frank, Epithetical Jurisprudence and the Work of the Securities and Exchange Commission in the Administration of Chapter X of the Bankruptcy Act, 18 N.Y.U.L.Q. Rev. 317, 349-50, 1941, and "one of the most disagreeable and perplexing tasks which falls to the lot of a District Judge," Silver v. Scullin Steel Co., 8 Cir., 98 F.2d 503, 506. Recognizing this, and recognizing, too, the peculiar advantage which the district judge has by virtue of his intimate knowledge of the whole history of the reorganization, appellate judges can come to the conclusion that the lower court has exceeded its discretion in granting allowances only with the greatest reluctance. That must be peculiarly so here where the reorganization was concededly successful. Nevertheless we cannot ignore the fact that the fees allowed amount to ten per cent of the estate upon the value originally set, and much more, even approaching twenty per cent, on the

debtor's claims of value at the close of the reorganization. Even in a small estate such a division of capital would seem large; in an estate of millions we can view it only as princely. We have often been admonished by the Supreme Court that in allowances of this sort we must avoid "vicarious generosity," In re Gilbert, 276 U.S. 294, 48 S. Ct. 309, 72 L.Ed. 580, and that "the desire to reduce the cost of reorganization [was] one of the controlling reasons for the enactment" of the bankruptcy statutes. Callaghan v. Reconstruction Finance Corp., 297 U.S. 464, 469, 56 S.Ct. 519, 521, 80 L.Ed. 804; Realty Associates Securities Corp. v. O'Connor, 295 U.S. 295, 299, 55 S.Ct. 663, 79 L.Ed. 1446; Dickinson Industrial Site, Inc., v. Cowan, 309 U.S. 382, 388, 60 S.Ct. 595, 84 L.Ed. 819; Brown v. Gerdes, 321 U.S. 178, 181-182, 64 S.Ct. 487, 88 L.Ed. 659; In re New York Investors, 2 Cir., 79 F.2d 182, 185, certiorari denied Endelman v. Reconstruction Finance Corp., 296 U.S. 649, 56 S.Ct. 308, 80 L.Ed. 462. To permit allowances of the magnitude involved here seems to us to contravene a fundamental policy of the governing statute. We take note of the somewhat bitter dispute as to the drain upon the working capital of the newly reorganized company and its present vicissitudes only to suggest that a successful reorganization placed in jeopardy by high fees allowed can point only to a dreary round with the debtor emerging from bankruptcy only to re-enter it after the lawyers are paid.

■ We have examined the applications for allowances of each of the parties involved here, with their detailed record of amount of time spent and the kind of work performed. We are not disposed to question the reasonableness of such fees by metropolitan practitioners for services of this kind when performed in the course of ordinary litigation. But in a reorganization proceeding, where the lawyers look for compensation to the debtor's estate which may belong, in equity, largely to others than those who have requested their services, they should have in mind the fact that

---

1. Annexed to this opinion as an appendix at its end is a table showing in detail the various amounts claimed, recommended, and allowed.

the total aggregate of fees must bear some reasonable relation to the estate's value. Under these circumstances they cannot always expect to be compensated at the same rate as in litigation of the usual kind. In re Standard Gas & Electric Co., 3 Cir., 106 F.2d 215, 216-217; In re Mt. Forest Fur Farms of America, 6 Cir., 157 F.2d 640, 647; London v. Snyder, 8 Cir., 163 F.2d 621.

In the process of fixing allowances it has been generally found desirable, first to determine the total amount which the estate can afford to bear and which it should justly pay for the benefit rendered to it, and thereafter to allocate this amount among the various claimants according to the value of the services which they performed. In this way the burden which fees place upon the estate can be kept within reasonable limits, and the spirit of the Bankruptcy Act observed in allowing only one fee for particular services, regardless of the number of attorneys involved in performing that service. Such a course, so often recommended by courts and commentators, Campbell v. Green, 5 Cir., 112 F.2d 143; In re Irving-Austin Bldg. Corp., 7 Cir., 100 F.2d 574, 579; Carlisle, Allowances in Corporate Reorganizations, A5 Corp. Reorg. 67, 68-9, 1942; Note, The Cost of Corporate Reorganization Under the Chandler Act, 52 Harv.L.Rev. 1349, 1352, 1939, would have been advantageous here in providing an effective control against compensation for services which only duplicate what others have done. Under § 77B, 11 U.S.C.A. § 207, which Chapter X has succeeded, we refused to allow any compensation to stockholders whose services were unnecessary, since a committee had been formed earlier to represent their interests. In re Porto Rican American Tobacco Co., 2 Cir., 117 F.2d 599. True, a main purpose of Chapter X was to "democratize" corporate reorganization; and the fact that one committee is already at work will now not be held to prevent committees or individuals intervening subsequently from receiving compensation. 6 Collier on Bankruptcy ¶13.02, pp. 4508-9, 14th Ed.1947. But this does not mean that the estate must now pay twice—or more—for the same services.

It means rather that where duplication of services by succeeding committees is not practically avoidable the amount which the services are worth should now be divided pro rata among the various parties who performed the duplicative services, rather than awarded to the first party in the field.

Unfortunately this case shows much duplication. We have allowances to eleven different representatives of creditor interests, although it early became apparent that the creditors would be paid in full. We have allowances to seven different representatives of preferred stockholder interests, and four different representatives of common stockholder interests. And yet it appears that the trustee and his counsel did a good job representing all these interests. In our view this duplication deserved careful consideration in the fixing of allowances. Newman & Bisco v. Realty Associates Securities Corp., 2 Cir., 173 F.2d 609; Teton, Reorganization Revised, 48 Yale L.J. 573, 605, 1939. Heed should be paid, too, to the fact that many of the services for which compensation is claimed involved phases of the administration of the estate which the trustee was already handling more than satisfactorily. There should be much hesitation about compensating such wasteful labor. In re New York Investors, Inc., 2 Cir., 130 F.2d 90; Carlisle, supra, A5 Corp. Reorg. 67, at 78.

It is true that a substantial reduction in the compensation for duplicating services will not greatly reduce the total cost to the estate in view of the large portion of the total going to the trustee and his counsel. Since these officers successfully carried the laboring oar in the proceedings, they should properly receive a major share of both the glory and the compensation. We gladly acknowledge the value of the devoted services of the trustee and his counsel in accomplishing the successful reorganization. We should not have expected less from men of such public spirit and high professional standing. Even so, we feel the generous bounds so indicated were overstepped in awards of $182,500 to the trustee and $535,000 to his counsel—a total of $717,500 to both. The compensation allowed was at a rate of roughly $40,000 a

year for the trustee and $120,000 a year for his firm. However reasonable such charges on the part of lawyers of this standing might have been when made in ordinary litigation, that, as we have seen, cannot be the criterion in proceedings of this nature. The trustee spent 8,123 hours working on the reorganization. He had no substantial overhead expenses, since the debtor supplied him with an office and a secretary. Thus his compensation for his services is at the rate of roughly $22.50 per hour. The records of the trustee's counsel indicate that 28,905 hours were devoted to the reorganization, so that the firm was compensated at a rate of roughly $18.50 per hour. Much of this highly-paid activity was for services of a sort which could well be performed by an accurate and sensible clerk; thus the application refers to such tasks as proofreading, supervision of printing and mailing, card indexing claims, supervising payments to creditors and the like. Of more significance is the fact that 18,340 of these hours, or almost two-thirds of the total, were put in by associates, rather than by the one partner in the firm who was extensively active in this proceeding.[2] Neither trustee nor counsel was required to give up all other activities or public service for exclusive attention to this estate. Considering how high a proportion of the total value of the estate the allowances to the trustee and his counsel involve, we are brought, not without reluctance, to the view that the amounts granted must be held excessive.

We should have had more doubts as to our conclusions just stated, had they not been re-enforced by those of the Securities and Exchange Commission. In a reasoned statement discussing each petition the Commission presented grounds for limiting the various allowances to sums totaling $750,-000. These amounts individually and collectively seem to us quite generous, indeed, perhaps more so than some of us would have granted as judges of first instance. They appear to support the statement of the Commission's able spokesman that these are not intended as minima to be increased by the court, but that in fact the Commission has raised its standards to match the compensation awarded by other judges in other cases.[3] The district judge, however, did not discuss these recommendations, or indeed the separate claims at all; but after stating the over-all picture of the successful reorganization merely expressed his conclusions, allowing an aggregate of 27% more than the Commission had recommended. We are thus left in the dark as to his reasons for rejecting the specific recommendations.

2. In a major railroad reorganization in this Circuit, compensation was limited to an average rate of $12 per hour for time spent by partners and about $4 per hour for their associates, In re New York, N. H. & H. R. Co., D.C.Conn., 46 F.Supp. 214, 220; and on appeal we noted that the same criteria of reasonableness apply in corporate and railroad reorganizations, Warren v. Palmer, 2 Cir., 132 F.2d 665. Applying here the ratio there employed of a rate of compensation to partners three times that to their associates, the compensation granted the counsel would be at the rate of $10.70 per hour for associates and $32 per hour for partners.

3. Thus note the following colloquy in the record:

Mr. Zolotar for the Commission after stating the recommendations: "We do not think that that is a conservative amount. I know a lot of people have an impression that the Securities and Ex-

change Commission always makes very restricted recommendations.

"The Court: You haven't been too generous.

"Mr. Zolotar: I do want to point this out to your Honor—

"The Court: And that is without any criticism too. I don't mean that by way of criticism.

"Mr. Zolotar: I understand what your Honor means, but I want to observe this fact that, as we have gone along in these proceedings, and after all we have been in this since 1938, as the courts have from time to time disagreed with us and have in many instances given more than we recommended, we have necessarily had to change our standards because, under these Chapter X proceedings, what we think is the standard is of no significance if the courts disagree with us. We are only here in an advisory capacity.

"The Court: I understand perfectly.

"Mr. Zolotar: So that as we have gone

Since the Commission's recommendations represent the expert opinion of a disinterested agency skilled and experienced in reorganization affairs, they should be a valuable aid to a judge in performing a difficult task. 6 Collier on Bankruptcy ¶13.02, p. 4498, 14th Ed.1947. Some courts have refused to give S. E. C. recommendations as to fees more weight than the suggestions of any other party, e. g., Cooke v. Bowersock, 8 Cir., 122 F.2d 977, 985; In re Detroit International Bridge Co., 6 Cir., 111 F.2d 235, 237-238. True, the Commission's function in a reorganization proceeding is purely advisory; and it does not have the power to fix a maximum amount for fees which it has with regard to the reorganization of public utility holding companies under § 11 (f) of the Holding Company Act, 15 U.S. C.A. § 79k(f), and which the Interstate Commerce Commission has with regard to a railroad reorganization under § 77, sub. c, (2, 12), of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. c, (2, 12). Nevertheless the figures presented by the S. E. C. are not "mere casual conjectures," but are "recommendations based on closer study than a district judge could ordinarily give to such matters." Frank, supra, 18 N.Y.U.L.Q. Rev. 317, 1941. We agree with District Judge Kirkpatrick's apt statement "that the Commission is about the only wholly disinterested party in the proceeding and that, while it may not be entirely familiar with 'the problems of making both ends meet in a law office' referred to by counsel, its experience has made it thoroughly familiar with the general attitude of the Courts and the amounts of allowances made in scores of comparable proceedings." In re Philadelphia & Reading Coal & Iron Co., D.C. E.D.Pa., 61 F.Supp. 120, 124. See also Note, 18 N.Y.U.L.Q.Rev. 399, 469-70, 1941, which suggests that the recommendations as to fees of the S. E. C. may be the only solution to the "very undesirable subjectivity with variations according to the particular judge under particular circumstances"

which has made the fixing of fees seem often to be "upon nothing more than an *ipse dixit* basis." And see Securities and Exchange Commission, Tenth Annual Report 148, 1944, Fourteenth Annual Report 85-6, 1948.

There are certain special cases which we must consider further. As to the others we have no other course than to remand them for the further consideration of the district judge, particularly in the light of the recommendations made by the Commission. As applied at least to the circumstances disclosed in this case we think these recommendations should not be exceeded without definite findings and conclusions showing why this step is deemed necessary. These proceedings involving fees have already been pending almost two years; they should reach an end in order that the claimants may receive their just compensation and the debtor know definitely the obligations it faces. To the end of expediting this proceeding it may therefore be assumed—notwithstanding some personal doubts noted earlier—that the Commission's recommendations, if adopted, may be considered affirmatively reasonable and properly allowable.

The first of the special cases we must now discuss involves three claimants who have received awards covering, in part at least, services performed before initiation of this proceeding. These are the McMeekan Committee, representing debenture holders and its counsel, Bergerman & Hourwich and Samuel A. Mehlman, awarded $6,000 and $25,000 respectively; Archibald Palmer, attorney for holders of Debentures and Stock, awarded $7,500; and Weinstein & Levinson, attorneys for holders of Debentures, awarded $1,000. The S. E. C. held that the latter had not proved their claim, and therefore recommended that nothing be awarded them. But it thought the activities of the McMeekan Committee of benefit to the reorganization and recommended an award of $4,000 to it and $20,- 000 to its counsel. And as to Palmer, who

along, as the courts have allowed more, we have necessarily recommended more in order to, in the particular case with which we are dealing, see that the applicants would get, on a comparative basis, something which would be equivalent or substantially equivalent to what the judges in this district and other districts have been awarding."

had been instrumental in securing dismissal of the prior involuntary proceeding, it held that he had "wittingly or unwittingly" uncovered information helpful in the reorganization, and recommended an award of $6,000 to him. Here we are constrained to disagree with the Commission in the basis it accepts for these awards.

Our doubts as to the legal basis for these awards, to the extent that they are based upon services rendered before the proceeding commenced, are made clearer by an analysis of them. The McMeekan Committee was formed in September, 1942, nine months before the filing of the involuntary petition and eleven months before the voluntary petition. The applications of the committee and its counsel show that much of their claims is based upon their services during this preliminary period. Those services consisted principally of urging debenture holders to refuse the voluntary exchange by which the debtor sought to avoid the necessity of reorganization. Such activity does not seem to us to have been of benefit to the estate, and it bears only the most tenuous relation to the plan of reorganization. So Palmer's opposition to the involuntary petition, resulting in its dismissal, and the immediate filing of the voluntary petition, does not seem to us—upon the mere statement and without supporting findings —to show benefit to the estate. It did alter the course of the proceedings; but there is nothing to show it changed their ultimate end. The S. E. C. does suggest something additional, namely that Palmer's examination of company officers and officials in his successful attempt to show collusion between petitioners and the debtor in this earlier petition did turn up evidence useful in establishing or in providing grounds of claim against these officials. As noted earlier, the trustee did make claim and prosecute an action covering these matters,

though we have no findings or other information as to how much use he may have made of the material thus "unwittingly" turned up by Palmer. But if we accept, as we doubtless should, the view that his actions were thus beneficial, we still face the problem as to their compensability in this later proceeding. It is to be noted that in the original proceeding Judge Rifkind, though conceding the value of Palmer's services for their intended purpose—the dismissal of that proceeding—held that they were not compensable under the Act. In re Childs Co., supra, D.C.S.D.N.Y., 52 F.Supp. 89. The anomaly of the grant here seems then apparent, particularly in the light of our decision in Palmer v. Kelby, 2 Cir., 138 F.2d 881, that services not compensable in the proceeding where rendered cannot be compensated for as contributing to a later proceeding.

But we think the issue should be faced more directly; shortly stated, the very tenuous statutory basis for any allowance [4] does not seem to us to justify awards for uncertain and somewhat problematical benefits thus conferred on the administration of an estate before it has begun. The difficulty is in seeing where much of any line can be drawn to reduce the potential contribution for prior activities during the always-occurring prior period of financial stress. Activities supporting the management will be beneficial as aimed at avoiding the disaster of bankruptcy; while activities opposing its excesses will be beneficial as hastening the curative and cleansing course of reorganization. The cases emphasize that when such allowances are made they must be for work which "directly contributes" to the reorganization; thus we have held that compensation is not allowable from the estate "for the work of the attorneys in conserving the debtor's assets" as well as in proposing an arrangement differ-

4. § 241 of the Bankruptcy Act, 11 U.S. C.A. § 641, singles out the *petitioning creditors* and their counsel—alone of those active before the reorganization— for specific mention in connection with allowances; while §§ 242, 243, 11 U.S. C.A. §§ 642, 643, providing *more general-*

ly for allowances for services in connection with the plan or "beneficial in the administration of the estate," could have been limited literally, as stated "in a proceeding under this chapter," i. e., a proceeding already under way.

ing from the reorganization finally effected. In re Ulen & Co., 2 Cir., 130 F.2d 303, 305. See also In re Realty Associates Securities Corp., 2 Cir., 156 F.2d 480; In re Mt. Forest Fur Farms of America, supra, 6 Cir., 157 F.2d 640, at 649–50; In re Barlum Realty Co., 6 Cir., 154 F.2d 562, 565; In re Building Development Co., 7 Cir., 98 F.2d 844; Stark v. Woods Bros. Corp., 8. Cir., 109 F.2d 969; In re Mortgage Guarantee Co., D.C.Md., 40 F.Supp. 226, 239–240. To have this direct connection it would seem that the services must not only be ultimately beneficial in some clearly observable way, but also have been directed toward the specific rehabilitation of the debtor which actually took place. Chance and unwitting action, or activities a year or so earlier to control the course of creditor pressure upon the debtor, would seem clearly outside the narrow limits of the precedents, even if these in turn do go somewhat beyond the literal statutory language. See In re Realty Associates Securities Corp., supra.

▮ This would dispose of the pre-reorganization claims of the McMeekan Committee and their counsel as well as of Palmer. It also necessarily disposes of the claim of Weinstein & Levinson. We agree with the S. E. C. that this claim was not too thoroughly proven; but, in these aspects, it can rise no higher than Palmer's claim, since it concerned the dismissal of the involuntary proceedings. As to all this group of claims, however, fairness would appear to require a remand in order that the trial court may determine whether services were performed by these claimants after initiation of these proceedings for which compensation should be allowed. It does appear that the Committee and their counsel continued their activities throughout the proceeding, though some at least of their work appears to have been of an administrative nature, such as reviewing proposed real estate transactions or making studies and analyses of the debtor's operations, and thus duplicative of work done by the trustee. There is more doubt on this record as to the continuing activities of the other two claimants; but since the approach below was on a different basis, we think they should have opportunity to make claim, if they can, on the basis which alone seems to us appropriate.

The final question concerns the allowances to Everett Frank and William S. Hernon, large stockholders who acted together in the negotiation, development, and support of the plan actually effected in what the S. E. C. terms the capacity of "reorganization managers." They were then active in the consummation of the plan, Frank becoming chairman of the Board and Hernon a director of the reorganized company. The activity of these men was directly beneficial to the estate, and they normally would be entitled to compensation under § 243 of the Act, 11 U.S.C.A. § 643, which specifically provides for the compensation of individual security holders for their participation in a reorganization. The S. E. C. contends, however, that these claimants should be denied compensation under the prohibition contained in the second sentence of § 249, 11 U.S.C.A. § 649, reading as follows: "No compensation or reimbursement shall be allowed to any committee or attorney, or other person acting in the proceedings in a representative or fiduciary capacity, who at any time after assuming to act in such capacity has purchased or sold such claims or stock, or by whom or for whose account such claims or stock have, without the prior consent or subsequent approval of the judge, been otherwise acquired or transferred."

The statute also requires any claimant for compensation to file with the court a statement under oath showing purchases or sales of stock, and Frank and Hernon had filed such statements showing extensive dealings in company stock. They were not formally a committee or concededly fiduciaries; but the S. E. C. contends that by the nature of their activities they were shown to be "acting in the proceedings in a representative or fiduciary capacity." The district court ruled to the contrary and awarded them $20,000 for their services.

There is authoritative dictum to the effect that "in all cases persons who seek compensation for services or reimbursement for expenses are held to fiduciary standards." Mr. Justice Douglas in Brown v. Gerdes, supra, 321 U.S. 178, at page 182, 64 S.Ct. 487, 489, 88 L.Ed. 659. Since any compensation awarded from the estate is at the expense of all the other security holders, there is some ground for urging denial of such compensation to those who have traded for their own gain, and thus have served interests other than those of all their class or of the whole estate. See Dickinson Industrial Site, Inc. v. Cowan, supra, 309 U.S. 382, at page 389, 60 S.Ct. 595, 84 L.Ed. 819; Young v. Higbee Co., 324 U.S. 204, 212–213, 65 S.Ct. 594, 89 L.Ed. 890; Berner v. Equitable Office Building Corp., 2 Cir., 175 F.2d 218, 220; Note, 18 N.Y.U.L.Q.Rev. 399, 475, 1941. But see 6 Collier on Bankruptcy ¶13.18, pp. 4593–4, 14th Ed. 1947. We do not go so far here, because we believe these claimants have acted in a "representative" capacity, and thus have brought themselves within the literal wording of the statute. The record is clear that they created a large bloc of preferred stockholders amenable to their directives, maintained its unity by frequent communication, effectively asserted its strength during the formulation and confirmation of a plan of reorganization, and exerted its power to assure the selection of a new management satisfactory to themselves.

■ Having persuaded many of their friends to buy the preferred stock, Frank and Hernon indulged in activity which is only consistent with the determination that they were "representing" these friends in the reorganization. They let it be known that they were speaking for one-third to one-half of the preferred stock—though their own individual holdings were not large—and they thus asserted an effective veto over the course of the proceedings. Frank procured regularly from the trustee up to fifty copies of monthly reports which were sent to his group of "friends." He and Hernon made every effort short of proxies to get their "friends" to vote for a plan which they favored. They used their "friends" to exert pressure with respect to a proposed board of directors before the court for approval. "Indeed, it is the rule in any reorganization under Chapter X that, whenever anyone undertakes to act on behalf of any part of a class, he becomes the representative of the whole class, and may not deal for any part of it alone." Berner v. Equitable Office Bldg. Corp., supra, 2 Cir., 175 F.2d 218, at page 220; Young v. Higbee Co., supra, 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890; Silbiger v. Prudence Bonds Corp., 2 Cir., 180 F.2d 917; In re Inland Gas Corp., D.C.E.D.Ky., 73 F.Supp. 785, 792.

■ Since Frank and Hernon acted as "representatives" of their group of friends, and thus of all the preferred stockholders, they must be denied compensation under the statute and their petition must be dismissed. Of course this does not mean that their activity was improper. Large stockholders have a perfectly legitimate right to attempt to shape a reorganization in the manner they think most desirable. And they have an equally legitimate right to trade in the securities of the debtor during the reorganization. But when they do, and thus embrace an opportunity to profit from their knowledge of the course of the reorganization, they forfeit their right to be compensated for their activity from the estate. The statute is "an absolute bar" to reimbursement wherever there has been insider trading of the type there proscribed. Otis & Co. v. Insurance Bldg. Corp., 1 Cir., 110 F.2d 333; Silbiger v. Prudence Bonds Corp., supra, 2 Cir., 180 F.2d 917; 6 Collier on Bankruptcy ¶13.18, p. 4586, 14th Ed. 1947.

The order appealed from is therefore reversed and the cause remanded for further proceedings consistent with this opinion.

## Appendix

Table showing claimants by groups, together with the amounts of compensation (a) requested, (b) allowed, (c) recommended by the Securities and Exchange Commission, and (d) now suggested by appellant as the maximum.

### A. *The Trustee and his attorneys:*

| Appellees | Requested | Allowed | SEC Recommendation | Appellant's Suggestion |
|---|---|---|---|---|
| 1. John F. X. Finn | $195,000 | $182,500 | $160,000 | $130,000 |
| 2. Lorenz, Finn & Lorenz | 599,000 | 535,000 | 425,000 | 350,000 |
| Totals | $794,000 | $717,500 | $585,000 | $480,000 |

### B. *Representatives of Creditors:*

| | Requested | Allowed | SEC Recommendation | Appellant's Suggestion |
|---|---|---|---|---|
| 3. McMeekan Debenture Holders Committee | $ 10,000 | $ 6,000 | $ 4,000 | $ 3,000 |
| 4. Bergerman & Hourwich and Samuel A. Mehlman, attorneys for McMeekan Committee | 65,000 | 25,000 | 20,000 | 15,000 |
| 5. Wise Debenture Holders Committee | 15,000 | 7,000 | 5,000 | 3,000 |
| 6. Marshall, Bratter Seligson & Klein, attorneys for Wise Committee | 40,000 | 20,000 | 15,000 | 10,000 |
| 7. Sullivan & Cromwell, attorneys for Marine Midland Trust Company, Debenture Trustee | 5,000 | 3,000 | 2,000 | 2,000 |
| 8. McNamara & Seymour, attorneys for Empire Trust Company, Debenture Trustee | 6,000 | 3,750 | 2,750 | 2,750 |
| 9. Weinstein & Levinson, attorneys for $2,000 of Debentures | 12,500 | 1,000 | 0 | 0 |
| 10. Ehrich, Royall, Wheeler & Holland, attorneys for $498,000 of Debentures | 3,500 | 1,250 | 750 | 0 |
| 11. Archibald Palmer, attorney for holders of Debentures and Stock | 15,000 | 7,500 | 6,000 | 0 |
| 12. New York Credit Men's Association, Secretary of Merchandise Creditors' Committee | 10,000 | 4,000 | 2,000 | 2,000 |
| 13. Levin & Weintraub, attorneys for Merchandise Creditors' Committee | 20,000 | 7,000 | 5,000 | 3,750 |
| Totals | $202,000 | $ 85,500 | $ 62,500 | $ 41,500 |

### C. *Representatives of Preferred Stockholders:*

| | Requested | Allowed | SEC Recommendation | Appellant's Suggestion |
|---|---|---|---|---|
| 14. Thompson Preferred Stockholders Committee | $ 20,000 | $ 9,000 | $ 7,500 | $ 6,700 |
| 15. Walter H. Pumphrey, Secretary to Thompson Committee | 350 | 350 | 350 | 300 |
| 16. Holmes, Rogers & Carpenter, attorneys for Thompson Committee | 75,000 | 32,500 | 20,000 | 20,000 |
| 17. Durrell Preferred Stockholders Committee | 25,000 | 8,000 | 3,500 | 2,500 |
| 18. Bernard Reis & Company, accountants for Durrell Committee | 7,500 | 2,000 | 1,500 | 500 |
| 19. Karelsen, Karelsen & Rubin and Paul J. Kern, attorneys for Durrell Committee | 75,000 | 32,500 | 30,000 | 20,000 |

| | | | | | |
|---|---|---|---|---|---|
| 20. | Everett Frank and William S. Hernon, Individual Preferred Stockholders | 75,000 | 20,000 | 0 | 0 |
| | Totals | $277,850 | $104,350 | $ 62,850 | $ 50,000 |

D. *Representatives of Common Stockholders:*

| | | | | | |
|---|---|---|---|---|---|
| 21. | Moss Common Stockholders Committee | $ 27,450 | $ 7,000 | $ 3,000 | $ 3,000 |
| 22. | Murphy, Block, Sullivan & Sawyer, attorneys for Moss Committee | 75,000 | 20,000 | 15,000 | 15,000 |
| 23. | Hetkin, Jervis & Hetkin, attorneys for Common Stockholders | 27,500 | 13,500 | 12,000 | 7,500 |
| 24. | Abraham K. Weber, attorney for Common Stockholders | 13,500 | 6,500 | 5,000 | 3,000 |
| | Totals | $143,450 | $ 47,000 | $ 35,000 | $ 28,500 |