**In the Matter of R. HOE & CO., INC., Debtor.**

**No. 69 B 461 (WCC).**

United States District Court,
S. D. New York.

July 25, 1978.

As Amended and Opinion Supplemented
Oct. 16, 1978.

As Amended Jan. 9, 1979.

---

James B. Kilsheimer, III, New York City, Trustee of the Debtor.

Robert M. Corrao, Scarsdale, N. Y., Additional Trustee of the Debtor.

Winthrop, Stimson, Putnam & Roberts, New York City, for the Trustees.

Townley & Updike, New York City, Special Counsel for the Trustees.

S. D. Leidesdorf & Co., New York City, Accountants for the Trustees.

Harold P. Seligson, Attorney for the Class A Stockholders' Committee, Ralph H. Haas, Chairman, Class A Stockholders' Committee, Irving Isaac, Security Analyst, New York City, for the Class A Stockholders' Committee.

Leinwand, Maron, Hendler & Krause, and Irving Schneider, New York City, for the Unofficial Creditors' Committee.

Eugene J. Zoda, New York City, as Executor of the Estate of Thomas E. Zoda c/o The Finn Company, Inc.

Levin & Weintraub, Sullivan & Cromwell, New York City, for the Debtor.

Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff in Selzer v. Stanton, 69 Civ. 2332.

Marvin E. Jacob, Jerome Feller, Bruce Siegel, New York City, for Securities and Exchange Commission.

## OPINION AND ORDER

CONNER, District Judge:

R. Hoe & Company, Inc. filed a petition for reorganization under Chapter X of the Bankruptcy Act in July of 1969. Proceedings related to the reorganization consumed a nine-year period and have now drawn to a close. Presently before the Court are the applications of numerous petitioners for awards of final allowances in connection with services rendered in the lengthy reorganization proceeding. A hearing on the applications was held before this Court on November 11, 1977. In awarding fees, the Court has taken full account of the written applications of the petitioners, briefs and supplemental letters furnished the Court, the testimony presented at the November 11 hearing, and the memorandum submitted by the Securities and Exchange Commission, which has participated as a party to this case since its inception in July 1969, pursuant to Section 208 of Chapter X of the Bankruptcy Act, 11 U.S.C. § 608.

### Background

A brief account of Hoe's history as a company and of the essential facts of the reorganization will suffice, for purposes of this Opinion, to place the fee applications in perspective.

Hoe is an old company whose history as a manufacturer of printing presses dates back to 1805. In July 1969, Hoe's principal business was the manufacture and sale of printing presses ("Press Division") and metal-decorating presses ("Metal Decorating Press Division"). In addition, Hoe was engaged in the manufacture and sale of saws and related products ("Saw Division").

Press operations, which comprised 90% of Hoe's business, were conducted out of Hoe's plants located in the Bronx, New York and Dunellen, New Jersey, while saw operations were conducted in the Bronx and in larger plants located in Birmingham, Alabama and Portland, Oregon. At the inception of the case, Hoe employed close to 2,000 persons, most of whom were engaged in press operations. Hoe had two classes of stock owned by public investors, Class A stock and common stock. The Class A, of which 448,704 shares were outstanding, was held by about 1,300 persons and the common stock of which 1,937,412 shares were outstanding, was held by about 5,000 persons.

The Press Division of Hoe was sold early in the case, and the Company was thereafter reorganized around its profitable Saw Division. The reorganized Hoe is thus a modest-sized company engaged in the manufacture and sale of saws and related products with annual sales of about $10–11 million and with profits in the range of $1–2 million. In its opinion of June 2, 1977, this Court valued the company at approximately 17 million dollars as a going concern. Hoe is now the employer of approximately 225 persons.

Shortly after Hoe's filing of its voluntary Chapter X petition, on July 7, 1969, John J. Galgay was appointed as trustee by the Honorable Sylvester J. Ryan, United States District Judge for the Southern District of New York.[1] On July 11, 1969, the law firm of Winthrop, Stimson, Putnam & Roberts was appointed general counsel to the trus-

---

1. The case was reassigned to the Honorable Harold R. Tyler, Jr., United States District Judge, in February 1974, when Judge Ryan took ill and became a senior judge. Judge Tyler was thereafter appointed Deputy Attorney General of the United States and the case reassigned to me.

tee. On July 22, 1969, S. D. Leidesdorf & Co. was appointed accountant to the trustee. On June 30, 1970, the law firm of Townley & Updike was appointed special counsel to the trustee.

Mr. Galgay was appointed a Bankruptcy Judge on June 27, 1973. Because of the imminence of this appointment, the Court appointed Robert M. Corrao as additional trustee on April 27, 1973 and James B. Kilsheimer III, Esq. as successor trustee to Mr. Galgay on May 9, 1973 (collectively "trustees"). Winthrop, Stimson, Putnam & Roberts, Townley & Updike and S. D. Leidesdorf & Co. continued to serve the trustee as general counsel, special counsel and accountants, respectively.

An internal plan of reorganization proposed by the trustees was approved by the Court on July 7, 1977 (the Third Amended Plan of Reorganization) and was confirmed on October 7, 1977. The confirmed Plan provided, in pertinent part, that administration and priority claims would be paid in full in cash; unsecured creditors whose claims are $500 (including interest) or less, or who reduce their claims to this amount, would be paid in full in cash; all remaining unsecured creditors would receive 5% of their claims (including interest) in cash and shares of common stock of the reorganized company at the rate of one share for each $5.00 of the balance of their claims; and each Class A stockholder would receive one share of common stock of the reorganized company for each 1.2 shares of Class A stock. The interests of common stockholders were eliminated.

Considering the posture of Hoe in July 1969, when the Company did not have funds even to meet its payroll, these proceedings have been successfully concluded. Difficult tasks were accomplished and problems overcome, including: (1) the renegotiation of outstanding contracts between the Debtor and certain press customers, resulting in substantial cash payments to the Debtor prior to completion of the presses and payments of premiums above the contract prices. These infusions of cash provided the necessary working capital to enable the Debtor to continue as a going concern; (2) sale of the Press Division and the Metal Decorating Press Division; (3) extensive negotiations with a secured creditor ("Talcott") asserting liens on all of Hoe's non-real estate assets and institution and settlement of a lawsuit seeking to set aside the liens; (4) institution and settlement of a lawsuit against Hoe's former auditors and management resulting in a substantial recovery for the estate and withdrawal of some $25 million in related shareholder proofs of claims; (5) formulation and confirmation of a plan of reorganization; and (6) relocation of Hoe's Bronx corporate offices and saw facilities to Eastchester and Mount Vernon, New York, respectively.

*Aggregate Allowances Sought and Financial Posture of the Estate*

The requests of petitioners aggregate $5,675,735, of which $1,844,795 has already been paid as interim allowances or otherwise,[2] leaving a net sum of $3,830,940 now sought. Additionally, reimbursement for expenses is sought in the amount of $52,-846.98. Five of the petitions are those of court-appointed officers, that is, the trustees, their attorneys and accountants. Not surprisingly, since these petitioners were charged with the principal responsibilities of administering the Debtor's affairs, their requests, totalling $5,355,735, comprise the bulk (94.4 percent) of the allowances sought.

Hoe's cash on hand (unaudited) as of September 30, 1977 was $4,710,147. At the November 11, 1977 hearing, the additional trustee furnished a projection of Hoe's excess cash as of February 28, 1978. That projection raised question then—and continues to raise question—as to the ability of the reorganized company to bear safely the fees and expenditures now sought. The net requests, including expenses, aggregate $3,883,786.98. According to the additional

---

**2.** This includes regular salary payments to the additional trustee and certain payments paid

one of the two law firms representing the Debtor.

trustee's projection, however, Hoe's cash balance at February 28, 1978 (after, *inter alia,* disbursements for cash distributions to creditors under the Plan, capital expenditures and allowances for required Saw Division working capital) was to be only $3,456,-147.[3]

■ Moreover, these fee requests must also be viewed from the perspective of the estate's present value. The payments requested by the applicants ($3.8 million) represent approximately 22.5% of the $17 million value of the estate as found by the Court. The Securities and Exchange Commission strenuously urges that payments in this amount would unduly burden the estate and possibility jeopardize the reorganization. Its own proposed figure for total final allowances would`represent maximum net payments of approximately 14% of the estate's present value, a percentage the Commission believes should not be exceeded. Specifically, the Commission recommends total final allowances of $4,163,335, of which $1,819,795 has already been paid in interim allowances (including regular salary payments to the additional trustee through September 30, 1977), leaving a maximum net sum of $2,335,540 to be paid by the Debtor,[4] or approximately $1.5 million less than is being sought by petitioners.

*Applicable Legal Principles*

■ The fundamental tenet that must guide the Court in the determination of final allowances is that Chapter X of the Bankruptcy Act is primarily a public investor protection statute that was enacted for the relief of debtors and their creditors and shareholders.[5] In practical terms, it is the creditors and Class A shareholders of Hoe who will bear the cost of paying the fees sought by petitioners in this case. Chapter X was derived from former § 77B of the Bankruptcy Act which "had as one of its chief purposes the establishment of a more effective judicial control over reorganization fees and expenses. One of the controlling reasons for enactment of the statute was a desire to reduce the costs of reorganization administration, which in equity receiverships were neither adequately controlled by the courts nor, in many cases, commensurate with the relief to or interests of the security holders. It was recognized by Congress that a depletion of the cash resources of a debtor's estate may have a severe effect on both the fairness and feasibility of a plan of reorganization, and that any determination by a court of the fairness and feasibility of a plan must logically include as one of its components a determination of the fairness and reasonableness of the amounts paid as fees and expenses to those participating in the reorganization case."[6] Notably, in replacing § 77B of the Bankruptcy Act in 1938, Chapter X "set up even more comprehensive supervision over compensation and allowances . . . and provided a centralized control over all administration expenses, of which lawyers' fees are a part."[7] In its Note to Rule 10–215 of the Chapter X Rules of Bankruptcy Procedure, entitled "Compensation for Services and Reimbursement of Expenses,"[8] the Advisory Committee states that "[t]he premise for including in these rules provisions governing the allowance of compensation to officers, attorneys, and ac-

---

**3.** Even if cash stringencies do not exist, the availability of cash is not, in and of itself, dispositive of appropriate fee awards. See discussion of Applicable Legal Principles, *infra.*

**4.** Excluding an $8,000 final allowance recommendation for one of the two law firms representing the Debtor. This sum has already been paid.

**5.** See, e. g., *Securities & Exchange Commission v. American Trailer Rentals,* 379 U.S. 594, 603–05, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965); *Securities & Exchange Commission v. U. S. Realty &* *Improvement Co.,* 310 U.S. 434, 447–49, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

**6.** 6A Collier on Bankruptcy ¶ 13.01 at 514 (14th ed. 1977).

**7.** *Brown v. Gerdes,* 321 U.S. 178, 181–82, 64 S.Ct. 487, 489, 88 L.Ed. 659 (1944).

**8.** Chapter X Rule 10–215, in effect since August 1, 1975, incorporates and summarizes existing law on the subject of allowances in Chapter X. See, generally, Advisory Committee Note to the Rule.

countants is that it is peculiarly a judicial responsibility to supervise the administration of estates and in particular to assure that allowances for compensation to those rendering services in connection therewith are fair but not excessive." The Advisory Committee notes further that "[t]he costs of bankruptcy administration have been a matter of continuing concern in the history of American bankruptcy law" and that "[t]his concern has led to an increasing recognition of the necessity for close judicial control of these costs."

Sections 241–244 of the Bankruptcy Act, 11 U.S.C. §§ 641–644, and Rule 10–215 thereunder, specify the persons who may properly apply for compensation and reimbursement of expenses in Chapter X and define in general terms the services that may be considered compensable. Insofar as is pertinent here, those sections provide that the judge may allow "reasonable compensation for services rendered and reimbursement for proper costs and expenses" to the following categories of persons: (1) a trustee and his counsel and other court-appointed officers,[9] and an attorney for the debtor (Section 241, 11 U.S.C. § 641; Rule 10–215(c)(1)(A); and (2) committees or representatives of creditors or stockholders and their attorneys or agents (Section 242, 11 U.S.C. § 642; Rule 10–215(c)(1)(B)).

Court-appointed officers such as a trustee, his counsel and accountants are charged with specific duties and responsibilities for which, as Section 241 indicates, they are entitled to "reasonable compensa-

tion," whether or not they can show benefit to the estate, as is required of other applicants.[10] Thus, while success in their reorganization endeavors is a factor to be considered in awarding compensation, lack of success does not necessarily bar compensation.[11]

Allowances to an attorney for a debtor are also provided for in Section 241. It has been held, however, that the inclusion of the debtor's attorney within Section 241, rather than Sections 242 or 243, was not intended to alter the principle that an allowance award to a debtor's attorney is based on a showing that services were of benefit to the estate or the proceedings.[12]

Similarly, as regards committees, their attorneys or agents, compensability is restricted to services which are shown to have benefited the estate or the proceedings.[13] Beneficial services include: (1) services which contributed to a plan of reorganization which has been confirmed by the judge; (2) services which contributed to the refusal of confirmation of other plans as unfair or unsound; and (3) services that were beneficial to the administration of the estate.[14]

The burden of proof is on the applicant. The applicant must show affirmatively that he has made a contribution to the objectives of the proceeding and establish the value of his services.[15] The Court considers each application on its merits, whether or not objections are filed or raised.[16] The mere participation in a reor-

**9.** This would include, for example, accountants pursuant to court order.

**10.** *In re Food Town, Inc.*, 208 F.Supp. 139, 145 (D.Md.1962); 6A Collier on Bankruptcy ¶ 13.02 at 545; ¶ 13.03 at 554, 559–62 (14th ed. 1977).

**11.** *In re Webb & Knapp, Inc.*, 363 F.Supp. 423, 426 (S.D.N.Y.1973).

**12.** *In re Porto Rican American Tobacco Co.*, 117 F.2d 599, 601 (2d Cir. 1941); *In re McGann Mfg. Co.*, 188 F.2d 110, 112 (3d Cir. 1951); 6A Collier on Bankruptcy ¶ 13.04 at 573 (14th ed. 1977).

**13.** Chapter X Rule 10–215(c)(1)(B); *In re Porto Rican American Tobacco Co.*, 117 F.2d 599, 601

(2d Cir. 1941); 6A Collier on Bankruptcy ¶ 13.-06 at 582–83, 587 (14th ed. 1977).

**14.** Sections 242, 243, 11 U.S.C. §§ 642, 643; Chapter X Rule 10–215(c)(1)(B); 6A Collier on Bankruptcy ¶ 13.01 at 522–24 (14th ed. 1977).

**15.** *Woods v. City National Bank & Trust Co.*, 312 U.S. 262, 268, 61 S.Ct. 493, 85 L.Ed. 820 (1941); 6A Collier on Bankruptcy ¶ 13.02 at 531 (14th ed. 1977).

**16.** *In re Philadelphia & Reading Coal & Iron Co.*, 61 F.Supp. 120, 125 (E.D.Pa.1945); 6A Collier on Bankruptcy ¶ 13.02 at 531–32 (14th ed. 1977).

ganization proceeding does not create a right to compensation.[17] Thus, attendance at hearings, examination of papers, the mere giving of advice, criticism and suggestions are not matters that in and of themselves establish a basis for compensation.[18] And, the estate should not bear the burden of duplication or multiplication of services.[19] The fact that several may espouse the same cause does not permit an increase in the aggregate allowance, for the estate is to be charged "only one fee for particular services, regardless of the number of [persons] involved in performing that service."[20] Nor should compensation be allowed for services rendered which were inept, unnecessary or wasteful.[21] The standard to be applied is the time that was necessarily required to accomplish the task rather than the time actually expended.[22]

■ A determination of a fair and reasonable fee in proceedings of this kind requires some knowledge or estimate of how much time was productive, necessary, routine or ministerial and duplicative. Towards this end, the courts have repeatedly stressed the importance of maintaining contemporaneous and adequate time records describing the services rendered; for example:

> "We wish to emphasize that any attorney who hopes to obtain an allowance from the court should keep accurate and current records of work done and time spent. Lawyers are well aware that, especially where services of the nature here involved are spread over a period of time and ultimate payment is virtually assured, they are valued principally on the basis of time required. There is no excuse for an established law firm to rely on estimates made on the eve of payment and almost entirely unsupported by daily records or for it to expect a court to do so." In re Hudson & Manhattan Railroad Company, 339 F.2d 114, 115 (2d Cir. 1964).

\* \* \* \* \* \*

> "We stress that it is the attorney's obligation to keep and submit to the court time records supporting an application for compensation. And, absent unusual circumstances, it is the court's independent obligation to give credit only where there are such supporting documents, even in cases where no interested parties raise objections to the claim." In re Meade Land & Development Co., Inc., 527 F.2d 280, 284 (3d Cir. 1975).[23]

■ The courts have also repeatedly admonished that the principle of strict economy must govern compensation in Chapter X cases,[24] and that applicants cannot expect to be compensated at the rates which similar services might command in private employment.[25] As stated in Finn v. Childs, 181 F.2d 431, 435–36 (2d Cir. 1950):

17. *Milbank, Tweed & Hope v. McCue*, 111 F.2d 100, 101 (4th Cir. 1940); *In re Food Town, Inc.*, 208 F.Supp. 139, 145 (D.Md.1962); 6A Collier on Bankruptcy ¶ 13.02 at 534–35 (14th ed. 1977).

18. *In re Hudson & Manhattan Railroad Co.*, 224 F.Supp. 815, 839–40 (S.D.N.Y.1963), modified on other grounds, 339 F.2d 114 (2d Cir. 1964).

19. *In re Solar Mfg. Corp.*, 215 F.2d 555, 560–61 (3d Cir. 1954); *Coskery v. Roberts & Mander Corp.*, 200 F.2d 150, 154–55 (3d Cir. 1952).

20. *Finn v. Childs*, 181 F.2d 431, 436 (2d Cir. 1950).

21. See, *In re Solar Mfg. Corp.*, 215 F.2d 555, 560–61 (3d Cir. 1954).

22. *In re Imperial "400" National, Inc.*, 432 F.2d 232, 237 (3d Cir. 1970); *United States v. Larchwood Gardens, Inc.*, 404 F.2d 1108, 1110 (3d Cir. 1968).

23. See also, *In re Borgenicht*, 470 F.2d 283 (2d Cir. 1972); *In re Wal-Feld Co.*, 345 F.2d 676 (2d Cir. 1965).

24. *In re Imperial "400" National, Inc.*, 432 F.2d 232, 238 (3d Cir. 1970); *Official Creditors' Committee of Fox Markets, Inc. v. Ely*, 337 F.2d 461, 465 (9th Cir. 1964); *Surface Transit, Inc. v. Saxe, Bacon & O'Shea*, 266 F.2d 862, 865 (2d Cir.), cert. denied, 361 U.S. 862, 80 S.Ct. 120, 4 L.Ed.2d 103 (1959); *London v. Snyder*, 163 F.2d 621, 625 (8th Cir. 1947).

25. *In re Imperial "400" National, Inc.*, 432 F.2d 232, 239 (3d Cir. 1970); *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 433 (5th Cir. 1968); *Finn v. Childs*, 181 F.2d 431, 435–36 (2d Cir. 1950); *In re Mount Forest Fur Farms of America, Inc.*, 157 F.2d 640, 647 (6th Cir. 1946).

"We have examined the applications for allowances of each of the parties involved here, with their detailed record of amount of time spent and the kind of work performed. We are not disposed to question the reasonableness of such fees by metropolitan practitioners for services of this kind when performed in the course of ordinary litigation. But in a reorganization proceeding, where the lawyers look for compensation to the debtor's estate which may belong, in equity, largely to others than those who have requested their services, they should have in mind the fact that the total aggregate of fees must bear some reasonable relation to the estate's value. Under these circumstances they cannot always expect to be compensated at the same rate as in litigation of the usual kind."

■ The emphasis placed on economy of administration is by no means a directive to be parsimonious. Allowances should—when resources with which to pay them are available—be liberal enough to encourage competent persons to render the onerous and socially useful labors incident to reorganization proceedings. Here, as elsewhere in the law, a balance must be struck among conflicting considerations. As the Court of Appeals for the Fifth Circuit has said:

"The public interest which is inherent in bankruptcy matters must be considered in awarding fees. The object is to draw a balance to the end that competent trustees and counsel are obtainable in matters of this kind because of the knowledge that they will be fairly compensated. They must not and cannot expect, however, to be overcompensated, for the

court must exercise its discretion for the double purpose of fairly treating the trustee and his counsel while at the same time doing equity to the debtor and creditors." *Massachusetts Mutual Life Insurance Co. v. Brock*, 405 F.2d 429, 432–33 (5th Cir. 1968).

■ Accordingly, the courts have set forth a number of factors that should be considered in arriving at an appropriate allowance.[26] Among these factors are: (1) the nature of the services rendered; (2) the difficulties and complexities encountered; (3) time necessarily expended; (4) the results achieved; (5) the burden the estate can safely bear; (6) the size of the estate; (7) duplication of services; (8) professional standing, ability and experience of the applicant; (9) fairness to each applicant; and, of course, (10) economy of administration.

■ Finally, the Court has relied heavily upon the recommendations of the S.E.C. respecting these Chapter X allowances as representing the expert opinion of a wholly disinterested agency skilled and experienced in reorganization affairs.[27] The rule in this Circuit is that such recommendations "should not be exceeded without definite findings and conclusions showing why this step is deemed necessary."[28]

*The Applications*

A. *The Trustees' Applications*

Messrs. Kilsheimer and Corrao seek final allowances of $630,000 for the approximate 4¾ years encompassing their trusteeship. Expressed otherwise, they are seeking

26. *Surface Transit, Inc. v. Saxe, Bacon & O'Shea*, 266 F.2d 862, 865 (2d Cir. 1959); *In re Paramount Merrick, Inc.*, 252 F.2d 482, 485 (2d Cir. 1958); *Matter of First Colonial Corp. of America*, 544 F.2d 1291, 1298–99 (5th Cir. 1977); *Jacobowitz v. Double Seven Corporation*, 378 F.2d 405, 408 (9th Cir. 1967); *Oklahoma Ry. Co. v. Johnston*, 155 F.2d 500, 502–03 (10th Cir. 1946); *In re Detroit International Bridge Co.*, 111 F.2d 235, 237 (6th Cir. 1940); *Matter of Imperial "400" National, Inc.*, 431 F.Supp. 155, 160 (D.N.J.1977); 6A Collier on Bankruptcy ¶ 13.02 at 541–42 (14th ed. 1977).

27. *Surface Transit, Inc. v. Saxe, Bacon & O'Shea*, 266 F.2d 862, 865 (2d Cir. 1959); *Finn v. Childs*, 181 F.2d 431, 438 (2d Cir. 1950); *In re Investors Funding Corp.*, 422 F.Supp. 461, 465 (S.D.N.Y.1976); 6A Collier on Bankruptcy ¶ 13.02 at 529–30 (14th ed. 1977).

28. *Finn v. Childs*, 181 F.2d 431, 438 (2d Cir. 1950); *Scribner & Miller v. Conway*, 238 F.2d 905, 907 (2d Cir. 1956); *Securities Investor Protection Corp. v. Charisma Securities Corp.*, 506 F.2d 1191, 1196 (2d Cir. 1974); *In re Polycast Corporation*, 289 F.Supp. 712, 722 (D.Conn.1968).

aggregate compensation at the rate of about $133,000 per annum for their services as chief executive officers during that period. They request no reimbursement of expenses.

The original trustee was awarded a final allowance of $185,000 for the approximate 3½ years of his trusteeship, or compensation at the rate of about $53,000 per annum. He expended more than one-half of his time on the Debtor's affairs. It may also be noted, that Hoe's chief executive officer at the inception of these proceedings in 1969 was paid $54,000 per annum for his full-time services.

When these trustees were appointed, Hoe was ripe for reorganization. The major impediments to reorganization had been largely overcome. The press contracts outstanding at the inception of the case had been renegotiated. Press operations and major assets associated with such operations had been sold. The Saw Division was profitable. The litigation with Talcott was for all practical purposes settled. And, the trustee's report under Section 167(5) of the Bankruptcy Act was, for the most part, prepared. The filing, transmittal and completion of the report was held in abeyance, however, pending settlement of the lawsuit against Hoe's former auditors and management.

The principal activities of the trustees were the general administration of the estate, operation and improvement of the Saw Division, and formulation of a plan of reorganization. Expenses were reduced in Hoe's sprawling and largely vacant Bronx facilities. Ultimately, the Bronx buildings were demolished. Attempts were made to sell the Bronx real estate. A substantial capital improvement program was implemented in Hoe's Portland and Birmingham saw plants. Hoe's Bronx corporate headquarters and saw operation were relocated. A plan of reorganization was formulated and confirmed by the Court. Clearly, these efforts and others were beneficial to the estate.

■ The trustees' applications present the problem of allocating fair and reasonable compensation in a dual trusteeship within the framework of the principle that only one fee should be awarded for particular services, regardless of the number of persons who performed them.[29] Mr. Kilsheimer states at page two of his Affidavit of Services that "in many respects" the services were "jointly performed." Mr. Corrao states at page two of his Affidavit of Services that "most" of the services were "jointly rendered by us." Mr. Kilsheimer further testified that "50 per cent of my time was together with Mr. Corrao either in person or on the telephone." [30] An analysis of the trustees' time records discloses that there were at least 300 discussions or conversations between the trustees, and more than 100 personal meetings or conferences between the trustees or in which both trustees were present. It thus seems clear, that there was much duplication of effort in the joint administration of this estate.

■ The S.E.C. recommends an aggregate final allowance to the trustees of $450,000, or an additional $229,645 for their efforts. Under the S.E.C.'s recommendation, the trustees' compensation for their joint efforts as chief executive officers would be about $95,000 per annum. Giving due consideration to the posture of the estate at the date of the appointment of the trustees, the nature and results of their services and the burden the estate can safely bear, the Court finds that this is fair and reasonable compensation and awards the trustees the sum of $450,000. The allocation of the allowance between them is set forth below.

1. *James B. Kilsheimer III, Successor Trustee*

■ Mr. Kilsheimer seeks a final allowance of $270,000, of which $27,500 has been

---

**29.** *Finn v. Childs,* 181 F.2d 431, 436 (2d Cir. 1950). As stated in the Advisory Committee's Note to Chapter X Rule 10–215, "the number of officers required to complete the administra-

tion of an estate should not be a factor augmenting its costs."

**30.** Transcript of November 11, 1977 hearing at 21.

paid as an interim allowance, leaving a balance of $242,500. The request covers the period of May 9, 1973, the date of his appointment, to the end of the case. Mr. Kilsheimer states that he had recorded 2,426 hours through September 16, 1977 on the Debtor's affairs.[31] His time records substantiate these time expenditures and are adequately detailed. He estimates that he will expend an additional 150 hours in winding up the estate.

Assuming a 48-week work year and a 40-hour work week, Mr. Kilsheimer will have expended about 30% of his time on Hoe during the approximate 4¾ years of his trusteeship. Thus, he is seeking compensation at the rate of about $57,000 per annum for his part-time services. On a full-time basis, his request would be equivalent to compensation of about $190,000 per year.

Mr. Kilsheimer is a partner in a law firm and appears to be billing the estate at customary charges as an attorney.[32] However, his function as contemplated by Section 189 of Chapter X, 11 U.S.C. § 589, is to ". . . operate the business and manage the property of the debtor . . .." In essence, Mr. Kilsheimer was one of two chief executive officers of Hoe charged with the responsibility of superintending its affairs. He was not retained to render legal services. Two large law firms were retained for that purpose.

Mr. Kilsheimer performed his services with impressive ability and dedication. In the context of this Chapter X case, however, his suggested figure of $270,000 as a final allowance is excessive. Particularly in the light of the part-time nature of his services and the fact that another trustee familiar with the business of the Debtor shared the burdens of the trusteeship, the Court awards Mr. Kilsheimer a final allowance of $165,000, in accordance with the recommendation of the S.E.C., leaving a

balance of $137,500 to be paid him. The award represents compensation for Mr. Kilsheimer's services as part-time joint chief executive officer of Hoe of about $35,000 per annum.[33]

### 2. Robert M. Corrao, Additional Trustee

Mr. Corrao seeks a final allowance of $360,000, of which $190,055 has been paid in the form of salary through September 30, 1977 and $2,800 by way of an interim allowance, leaving a balance of $167,145. The request covers the period from April 27, 1973, the date of his appointment, to the end of the case. He states that he has devoted 7,140 hours on the Debtor's affairs. His time records substantiate these time expenditures and are adequately detailed. He estimates that he will expend an additional 436 hours until the end of the case. Mr. Corrao has rendered full-time services to the estate throughout the approximate 4¾ years of his trusteeship. Thus, he requests compensation at the rate of about $75,000 per annum.

Mr. Corrao was first employed by Hoe in 1958 in its financial department. From early 1968 until his appointment as additional trustee, he was the treasurer of Hoe. Upon his appointment in April 1973, his salary was raised from $33,000 to $40,000 per annum. On June 17, 1976, the Court authorized an increase in Mr. Corrao's salary to $50,000 per annum. Mr. Corrao continues to receive that salary.

In addition to consulting with Mr. Kilsheimer on policy and other management decisions, Mr. Corrao was responsible for the successful day-to-day operations of the Debtor. Insofar as the trusteeship was concerned, he appears to have carried the laboring oar in connection with the conduct of the business and the plan of reorganization. Mr. Corrao, for example, valued Hoe, testified extensively at the plan hearings,

---

**31.** Mr. Kilsheimer also seeks compensation for 150 unrecorded hours. This time is not compensable. *In re Hudson and Manhattan Railroad Company,* 339 F.2d 114, 115 (2d Cir. 1964); *In re Meade Land & Development Co., Inc.,* 527 F.2d 280, 284 (3d Cir. 1975).

**32.** His request, including future expenditures of time, computes out to a $104.81 hourly rate.

**33.** On a full-time basis, this would be equivalent to compensation of about $117,000 per year.

and prepared the numerous exhibits introduced by the trustees.

■ The S.E.C. recommends a final allowance to Mr. Corrao of $285,000, leaving a balance of $92,145 to be paid him. In the Court's view, the S.E.C. has given due regard, on the one hand, to the full-time nature of Mr. Corrao's services and the results achieved, and, on the other, to the joint nature of the trusteeship and the fact that this allowance is supplemental to Mr. Corrao's regular salary, which he has been receiving throughout. The Court therefore awards Mr. Corrao the recommended final allowance of $285,000. Under the award, Mr. Corrao's compensation for services as a full-time joint chief executive officer would be effectively increased to the equivalent of about $60,000 per annum from the date of his appointment in 1973 to the end of the case.

B. *Winthrop, Stimson, Putnam & Roberts ("Winthrop, Stimson"), General Counsel for the Trustees*

■ Winthrop, Stimson is a law firm consisting of 34 partners and 74 permanent associates. This firm has served as general counsel since the beginning of this case. Winthrop, Stimson requests a final allowance of $3,289,630, of which $933,720 has been paid in two interim allowances, leaving a balance of $2,355,910. Applicant also requests reimbursement of expenses of $40,177.29.[34] The period encompassed by the fee request is from July 7, 1969 through the end of the case. Expenses are sought for the period from January 1, 1974 through June 16, 1978.[35]

Numerous lawyers worked on the case. From July 7, 1969 through June 30, 1970, 45

lawyers—15 partners and 30 permanent associates—were engaged in the matter. During the first year of the proceeding, approximately 25% of Winthrop, Stimson's total claimed time was expended. From July 1, 1970 through December 31, 1973, 60 lawyers—nine partners and 51 permanent associates—worked on the matter. During these 3½ years, approximately 40% of Winthrop, Stimson's total claimed time was expended. From January 1, 1974 through September 23, 1977, 36 lawyers—eight partners and 28 permanent associates—worked on the matter. During this period of slightly more than 3½ years, approximately 35% of Winthrop, Stimson's total claimed time was expended.

Winthrop, Stimson's petition reflects total time expenditures of 36,760.75 hours through September 23, 1977. Partners expended 8,123.75 hours (22% of total time) and associates 28,637 hours (78% of total time). Applicant has also estimated additional expenditures of 863.16 hours to the end of the case. Thus, final compensation is sought on the basis of 37,623.91 hours.

As the S.E.C. notes, Winthrop, Stimson carried the legal burden from the outset. Although these proceedings presented difficult and complex problems, there was only one significant appeal from rulings of the District Court[36] and no competing plans of reorganization and their attendant complexities. The time records substantiate the number of hours billed and contain adequate descriptions of the nature of the services rendered. The law firm's performance was consistently of a high caliber.

Several considerations, however, militate against a $3.3 million award as requested by the applicant. The fee sought is based

**34.** These figures reflect supplemental affidavits submitted by Winthrop, Stimson with respect to reimbursement of expenses (June 27, 1978) and final allowance (July 10, 1978).

**35.** Expenses through December 31, 1978 of $53,102.41 have been paid.

**36.** *Abarta Corp. v. Kilsheimer,* 508 F.2d 1126 (2d Cir. 1975), in which the Court of Appeals held that a press customer was entitled to a general unsecured claim in the amount of the

premium it had paid upon the renegotiation of its press contract, thus reversing a decision of Judge Ryan. Another appeal, filed by the Class A Stockholders' Committee and the Unofficial Creditor's Committee, from the order approving the 1972 modification of the Wood agreement was withdrawn shortly after it was filed. A third and patently frivolous appeal, filed by a shareholder from the order confirming the plan of reorganization, was summarily affirmed by the Court of Appeals from the bench.

upon Winthrop, Stimson's normal hourly billing charges to its private clients throughout the period covered by the petition. Its request is equivalent to a mixed hourly charge of $87.43. It appears from testimony given by a partner of Winthrop, Stimson at the November 11, 1977 hearing that the firm drew up its request on the basis of private sector rates with an awareness that the amount would ultimately have to be reduced by the Court in accordance with the limitations that have been placed upon fee awards in Chapter X proceedings.

■ A factor particularly to be borne in mind here—and emphasized by the S.E.C.— is that much time was expended at uneventful meetings, routine hearings, handling general corporate matters and customary problems arising from the day-to-day operations of the business, preparing reports and dealing with creditor and shareholder inquiries. Such work, to the extent necessary, is compensable, but does not demand as high a degree of legal skill or experience as the other services performed in this case, nor justify as high a rate of compensation.

An unusually large number of lawyers also worked on the case for Winthrop, Stimson. The S.E.C. correctly observes that the use of many lawyers to cope with the problems of a single estate may sometimes be necessary, but when done on a sustained basis over a protracted period of time, it results in unavoidable duplication and creates inefficiencies in terms of familiarization and communication.

On the record, the Court concludes that the $2.5 million figure suggested by the S.E.C. will yield Winthrop, Stimson reasonable compensation for the services performed. In adopting this figure, the Court emphasizes that it has carefully examined the data submitted by Winthrop, Stimson on the billing rates and length of employment of the particular partners and associates who worked on the Hoe matter since its inception. This information will remain

confidential at Winthrop, Stimson's request; suffice it to say that rates of the order Winthrop, Stimson charges its private clients would be prohibitive in a Chapter X case. The $2.5 million awarded here results in a mixed hourly charge of $66.45, and may be computed as yielding associates an hourly rate of approximately $57 and partners approximately $100.[37] Given Hoe's financial position, and the factors considered heretofore, the Court would have no warrant for increasing the S.E.C.'s recommended allowance. Accordingly, Winthrop, Stimson is awarded $2,500,000, leaving a balance due of $1,566,280. The request for reimbursement of expenses is granted in the amount of $40,177.29.

C. *Townley & Updike (formerly Townley, Updike, Carter & Rodgers), Special Counsel for the Trustees*

Townley & Updike is a law firm consisting of 16 partners and some 24 associates. Pursuant to an order, dated June 30, 1970, this firm was retained as special counsel for the trustee for the following matters: (1) the conduct of the investigation required by Section 167(2) and (3) of the Bankruptcy Act, 11 U.S.C. § 567(2) and (3); (2) the defense of the Debtor in certain independent actions commenced by shareholders; (3) the representation of the trustee with respect to proofs of claim in excess of $25 million filed in this proceeding on behalf of the class in the aforesaid shareholder actions; (4) the commencement of any actions on behalf of the trustee against third parties for fraud, mismanagement or other irregularities prior to the inception of this proceeding.

After an extensive investigation, including 77 days of taking testimony before a bankruptcy judge, Townley & Updike commenced a lawsuit on July 2, 1971 against Hoe's former auditors and management (*Galgay v. Lybrand, Ross Bros. & Montgomery*, 71 Civ. 2988—S.D.N.Y.). Three years later, after long and difficult negotiations,

---

**37.** This calculation assumes the same percentage allocation of time expenditure by partners and associates (22 percent and 78 percent, respectively) for the 863.16 "additional" hours as for the remainder of the time charged (36,760.-75 hours).

this lawsuit was settled, together with the shareholder actions, in a "global settlement." The settlement resulted in, among other things a net recovery to the Hoe estate of $2,158,565.67 and a withdrawal of the $25 million in shareholder proofs of claim. Other shareholder proofs of claim totalling $80 million filed by persons excluded from class status in the above shareholder actions were dismissed as a matter of law. Townley & Updike also instituted a lawsuit against one Robert Marcus, a former consultant of Hoe, to recover insider trading profits. This action was settled for $50,000 and a withdrawal of a $296,000 proof of claim filed by a corporation beneficially owned by the Marcus family. In addition, Townley & Updike prepared those sections of the Section 167(5) Report relating to the matters for which they were retained.

Townley & Updike seeks a final allowance of $572,220, of which $195,720 has been paid as an interim allowance, leaving a balance of $376,500. The petition reflects total time expenditures of 5,159 hours. Partners expended 3,467 hours (67% of the total time) and associates 1,692 hours (33% of the total). Applicant's contemporaneous time records support the time claimed to have been expended and contain adequate descriptions of the services rendered. The total fee request is equivalent to a mixed hourly charge of $110.92.

The total allowance sought by Townley & Updike is based upon a division of the time spent into non-contingent and contingent parts. The non-contingent work comprised 2,750 hours (partners—1,449 hours and associates—1,301 hours) for which Applicant requests $222,220 based on its normal rates,[38] resulting in a mixed hourly charge of $80.81 for these services. The contingent work comprised 2,409 hours (partners—2,018 hours and associates—391 hours) for which Applicant seeks $350,000 based on its normal rates plus a contingent factor, resulting in a mixed hourly charge of $145.29 for these services.

Townley & Updike traces its right to have a portion of its final allowance determined on a contingency basis to a proceeding before Judge Ryan on June 30, 1970, when the firm was retained as counsel to the trustee. Judge Ryan then stated:

"some of the work which would be done by the firm of Townley & Updike . . would be for compensation which would be in a large measure determined by the results accomplished and the results achieved. To that extent, it would be contingent."

When Townley & Updike applied for an allowance in 1974, Judge Tyler, then presiding over the Hoe reorganization, commented that "to a significant extent," at the time of its retention, "it was uncertain as to whether or not [Townley & Updike] would get any more than its expenses plus perhaps a minimal token fee. Hence . . that firm . . . did run considerable risk."

 These statements, although they lend an element of ambiguity to the basis of Townley & Updike's fee, are far from a definitive indication that a contingency factor, in its normally understood sense, was meant to be applied in the determination of a final allowance.[39] The June 30, 1970 retention order makes no reference to contingent services. So far as Judge Ryan's comments are concerned, the S.E.C. argues persuasively that he was merely restating the applicable law: that compensation for litigation in Chapter X by trustee's counsel is in part, if not large part, determined by the results achieved. In this sense, risk is assumed in the representation of the Debtor. The S.E.C. rejects the contention, however, that Townley & Updike might have been paid little or nothing for its services. Its position, with which the Court concurs, is

---

**38.** $95 per hour for partners' time and $65 for associates' time.

**39.** The only case cited by Townley & Updike in support of its position, *In re Equity Funding Corp. of America Securities*, 438 F.Supp. 1303 (C.D.Cal.1977), is one involving the award of an attorney's fee on a contingency basis in a class action as opposed to a bankruptcy reorganization, where the underlying considerations are significantly different.

that Hoe always had sufficient funds to pay fees to Townley & Updike, and that there was no reason to doubt, at the time of appointment or thereafter, that the Court would award reasonable compensation, even if Townley & Updike's efforts had failed. The law is well settled that the unsuccessful outcome of litigation pursued by trustee's counsel in a Chapter X case does not bar reasonable compensation for efforts expended.[40]

■ The Court therefore declines to award Townley & Updike a partial final allowance on a contingency basis. It does not question, however, that the firm has rendered skilled, efficient and valuable services to this estate as investigation and litigation counsel. In light of all of the above, the Court awards Townley & Updike a final allowance of $450,000,[41] in accordance with the recommendation of the S.E.C., leaving a balance due of $254,280. The request for reimbursement of expenses is granted in the amount of $1,522.42.[42]

D. *S. D. Leidesdorf & Co. ("Leidesdorf"), Accountant for the Trustees*

■ Leidesdorf seeks a final allowance of $863,885, of which $470,000 has been paid in the form of two interim allowances, leaving a balance of $393,885. Services rendered cover the period of July 22, 1969, the date of Leidesdorf's retention, through the end of the case. In addition, Leidesdorf requests reimbursement of expenses of $15,984.53 from April 1, 1974 through the end of the case.

Leidesdorf made two prior fee applications under the original July 22, 1969 retention order, seeking compensation of $619,600 for services rendered from July 22, 1969 through March 31, 1974. Departing from then customary Chapter X practice relating

to the appointment of a trustee's accountant, and over the objection of the S.E.C., the original retention order did not specifically detail the scope of Leidesdorf's engagement, set a maximum amount for the engagement, or fix Leidesdorf's specific hourly rates. In response to both fee applications, the S.E.C. advised the Court that the rates charged by Leidesdorf were excessive in the context of a Chapter X case. By memoranda dated September 15, 1970 and July 3, 1974, the S.E.C. recommended $457,092 as *full* compensation, based upon the rates charged by Leidesdorf during the July 22, 1969–March 31, 1974 period in two other Chapter X cases pending in the Southern District of New York.[43] The Court awarded $470,000 as an interim fee.

On September 16, 1974, Judge Tyler entered an order, at the request of the S.E.C., fixing Leidesdorf's hourly rates, effective April 1, 1974, detailing the scope of the engagement, and setting a $100,000 maximum for services rendered after April 1, 1974. This maximum was increased by order, dated September 29, 1975, to $200,000. The hourly rates remained the same.

In its present fee application, Leidesdorf seeks, first, the sum of $149,600—the difference between the amount sought and the amount awarded by the Court for the July 22, 1969–March 31, 1974 period. The S.E.C. urges that the $470,000 previously awarded represents fair and reasonable compensation for that period and should not now be supplemented.

The issue is a troublesome one. In July of 1969, when Leidesdorf was retained, it had proposed a range of hourly rates that would be applicable to its services. The proposed rates were set forth in an affidavit of a Leidesdorf partner (Kermit Easton), which was annexed to the trustee's

---

**40.** See, e. g., *In re Webb & Knapp, Inc.*, 363 F.Supp. 423, 426 (S.D.N.Y.1973).

**41.** The award is equivalent to a mixed hourly charge of $87.22. Such an award is warranted in view of the substantial expenditure of partner time which yielded the significant results of which the Court has spoken.

**42.** Townley & Updike was earlier awarded $13,773 for reimbursement of expenses.

**43.** *In re Yale Express Systems, Inc.*, 65 B 404, for the first period covering July 22, 1969 through June 30, 1970, and *In re Beck Industries, Inc.*, 71 B 523, for the second period covering July 1, 1970 through March 31, 1974.

petition seeking a court order authorizing the appointment of Leidesdorf as accountants in the Hoe reorganization. The trustee stated in his petition that the rates in question appeared to be fair and reasonable in relation to the services to be performed and the professional skill and experience of the personnel involved.

Leidesdorf states in its present petition that these rates were approximately 20 percent less than its normal billing rates. The $619,600 that was requested for the July 1969–March 1974 period therefore represented a 20 percent reduction from normal charges. A $470,000 final allowance, as proposed by the S.E.C., would represent a 39 percent reduction from normal rates. The fact is, however, that the range of fees that was to be charged by Leidesdorf was presented to the Court in 1969—with a stamp of approval from the trustee—prior to the Court's granting of the original retention order. Additionally, the rate schedule that was fixed by Judge Tyler for the period subsequent to April 1, 1974 involved a reduction of only 25 percent from normal fees.[44] The S.E.C. does not contest Leidesdorf's entitlement to full compensation based on such rate schedule for the post-April 1974 period.

The more drastic reduction sought by the S.E.C. for the 1969–1974 period must have a firmer foundation than has been presented thus far. The S.E.C. has simply argued that the $470,000 figure is comparable to that awarded Leidesdorf in two contemporaneous Chapter X proceedings. It does not say, however, whether the circumstances of those cases were sufficiently similar to those here to justify automatic reliance on the rates that were applied. In any event, the Court is more concerned with whether the particular rates that were proposed by Leidesdorf in *this* case in 1969, and which formed the basis for its fee request, were reasonable and warranted by the services that were performed by Leidesdorf in this case for the period in question.

Both the S.E.C. and Leidesdorf should be heard on this issue, and, accordingly, the Court will accept submissions from the parties within 60 days of the filing of this Opinion and Order. Decision on this phase of the Leidesdorf fee application is reserved in the meantime.

Leidesdorf seeks $210,335 for services rendered from April 1, 1974 through September 16, 1977 based on the Court-authorized rates, and reimbursement of expenses of $12,484.53 for that period. The S.E.C. does not object to Leidesdorf's request for an increase of their maximum, *nunc pro tunc,* to cover the additional $10,335 of time charges, noting that the applicant's time records and expense vouchers support the claimed time expenditures and disbursements. Accordingly, the Court adopts the S.E.C.'s recommendation and awards Leidesdorf a final allowance of $210,335 for the period of April 1, 1974 through September 16, 1977, and disbursements of $12,484.53.

Leidesdorf also requests $33,950 for services to be rendered and $3,500 for expenses to be incurred during the period after preparation of their application (post-September 16, 1977) at the rates heretofore authorized by the Court. Although the Court has no objection to the increase of Leidesdorf's maximum to cover these services, it believes, with the S.E.C., that these payments should be made only upon submission of a supplemental affidavit.

In sum, Leidesdorf is awarded final compensation of $680,335 for its services from July 22, 1969 through September 16, 1977, leaving a balance due of $210,335. As noted, the Court will consider argument in favor of an additional allowance for the period of July 22, 1969 to March 31, 1974 and will entertain a supplemental affidavit for an allowance and for disbursements for the period subsequent to September 16, 1977. Leidesdorf is also granted reimbursement of expenses of $12,484.53 for the period of April 1, 1974 through September 16, 1977.

---

**44.** A partner of Leidesdorf (Kermit Easton) testified at the November 11, 1977 hearing that the rate schedule represented approximately a 33 percent reduction from normal fees.

E. *Class A Stockholders' Committee, Unofficial Creditors Committee and Their Representatives*

■ As indicated above, compensation of committees and their representatives in Chapter X is governed by Section 242 of the Bankruptcy Act, 11 U.S.C. § 642. Unlike Section 241, 11 U.S.C. § 641, governing the compensation of a Chapter X trustee and his counsel, Section 242 restricts compensation to services beneficial to the estate or the proceedings.

1. *Harold P. Seligson, Esq. ("Seligson"), Attorney for Class A Stockholders' Committee*

■ Seligson requests a final allowance of $170,000 for services rendered as counsel to the Class A Stockholders' Committee. He also requests reimbursement of expenses of $135.00. Seligson has expended 1,127 hours in this case, including 10 hours of assistance rendered to him by tax counsel. Thus, his request represents a rate of approximately $151 per hour.

Seligson is a seasoned bankruptcy practitioner with some 45 years of experience in reorganization cases. He is bankruptcy counsel to a New York City law firm. His participation on behalf of Class A stockholders in the Hoe reorganization has been vigorous and active. Although the trustees paid little tribute to the value of his services at the November 11, 1977 hearing, the facts speak for themselves. Particularly in respect of his participation in the plan phase of this reorganization, Seligson's substantial efforts did contribute to the outcome of these proceedings, as the S.E.C. readily acknowledges. He examined at length the additional trustee at plan hearings and presented his own witnesses. He thoroughly briefed and argued the question of the rate of interest to be paid on creditor claims. His contention that the rate of interest should be the interest rate of judgments, rather than the higher legal rate proposed by the trustees, was adopted by the S.E.C. in its Advisory Report. The Court ultimately directed use of the lower interest rate, resulting in a reduction of creditor claims of about $800,000. Over strong opposition by the trustees, Seligson successfully contended that the trustees undervalued Hoe. In this connection, it may be noted that the trustees initially asserted that the estate was insolvent and that the Class A stockholders should be precluded from participation under the plan. In substantial part as a result of Seligson's efforts, Class A stockholders were allocated 363,837 shares of the reorganized company's stock under the confirmed plan.

Seligson's contributions cover even a wider spectrum than the S.E.C. has noted in its memorandum. Although there is some dispute on the question, the Court finds that he was instrumental in having the tax loss carry forward include the loss to be sustained by reason of the payment of interest to creditors in stock. This increased the discounted value of the tax loss in excess of $1.15 million. He also successfully opposed the S.E.C.'s recommendation that the creditors receive 15 percent of their claims in 8 percent notes. This avoided annual interest charges on $1.3 million.

In determining his allowance, however, account must also be taken of the fact that a large portion of his effort was expended in reviewing papers, attending hearings and conferences and having discussions with the sole surviving member of the Class A Stockholders' Committee, with little concomitant benefit to the estate. All factors considered, however, the Court believes that Seligson is entitled to higher compensation than the S.E.C. has recommended. Its final allowance figure is $55,000, which computes out to an hourly rate of $48.80. Seligson's usual billing rate in private practice is $150 an hour. This is naturally far in excess of what could be paid here. However, Seligson is someone whose caliber of service was of value to the Court and whom the Court would wish to encourage to render like service in bankruptcy reorganizations in the future. Bearing in mind, however, the utmost importance of limiting the burden on the estate, Seligson is awarded final compensation of $100,000, which is equivalent to an hourly rate of approximately $90.

## 2. Ralph H. Haas ("Haas"), Chairman of Class A Stockholders' Committee

 Haas seeks $7,500 as a final allowance for services rendered as Chairman of the Class A Stockholders' Committee.[45] He also requests $1,480.61 for reimbursement of expenses. The Court has considered Haas' formal petition as well as his November 17, 1977 letter to the Court. Although he claims to have expended 445 hours on this matter, his time records reflect expenditures of only 148.5 hours. The S.E.C.'s position is that this is all he can receive credit for, and the Court is constrained to agree. His services, for the most part, involved discussions with Seligson, the Committee's counsel, and the review of papers. It does not appear that there were significant contributions made to the case by the Committee, other than the services rendered by its counsel. In any event, it is difficult to identify specific contributions by Haas.

Since his compensable services were minimal, the Court awards him nominal final compensation of $1,500, in accordance with the recommendation of the S.E.C. Haas included in his expense request $1,200 for the "rental value" of his own business office, which he claims served also as the Committee's office. This the Court disallows. Accordingly, reimbursement of expenses is granted in the reduced amount of $280.61

## 3. Irving H. Isaac ("Isaac"), Security Analyst for the Class A Stockholders' Committee

 Isaac requests $3,500 for services rendered in connection with his valuation of Hoe's Wood stock and related testimony at plan hearings. He claims to have expended about 50 hours in making the valuation and appearing in Court to testify. The S.E.C.

maintains that his valuation of this asset of Hoe was of no value to the estate and was rejected by the Court and that his application should therefore be denied. However, as a disinterested expert witness, his analysis of the investment value of the Wood shares and of the earnings of Wood were of some utility. Accordingly, he is awarded an allowance of $1,000.

## 4. Leinwand, Maron, Hendler & Krause ("Leinwand") and Irving Schneider ("Schneider"), Attorneys for the Unofficial Creditors' Committee

 A joint application has been filed by Leinwand and Schneider seeking final compensation of $75,000. Applicants submit that 518¾ hours were expended by them through September 28, 1977 on this case.[46] However, this time was all expended by Leinwand. No precise number of hours are claimed for Schneider, as he failed to maintain any time records. According to the S.E.C., Schneider's services have been negligible, at best, and in the absence of time records, no compensation can or should be paid from this estate for such services.[47]

Leinwand's time records show that 70 hours were spent at 46 court hearings (13% of the total claimed time); 19 hours spent at seven meetings (4% of the total claimed time); 185.75 hours on reviewing and analyzing legal papers (36% of the total claimed time); and 29 hours on correspondence (6% of the total claimed time). The remaining 41% of Leinwand's claimed time expenditures through September 28, 1977 are largely estimates of telephone calls over an eight-year time span unsupported by any time records. Insofar as these claimed services are concerned, such lump sum time estimates long after the event do not, as a matter of law, afford an adequate basis for

---

**45.** The Committee originally consisted of Mr. Haas and one other person. The other member died in 1971.

**46.** Applicants estimate an expenditure of an additional 115 hours to the end of the case. The Court gives no weight to such further expenditures of time, particularly since the mechanics of consummating the plan are the re-

sponsibility of the trustees and their general counsel.

**47.** In re Hudson & Manhattan Railroad Co., 339 F.2d 114, 115 (2d Cir. 1964); In re Meade Land & Development Co., 527 F.2d 280, 284 (2d Cir. 1975).

charging the Debtor's estate.[48] Furthermore, Leinwand seeks compensation for its efforts (40 hours) in preparing and supporting its final request. This time is also not compensable.[49]

Insofar as its legal services are concerned, the Court is in agreement with the S.E.C. that Leinwand played an extremely limited role.

Leinwand's letter to the Court of January 24, 1978 (per Elliot Krause), in response to the memorandum of the S.E.C., does not alter this view. Essentially, it supports the S.E.C.'s observations that, overall, Leinwand took few positions on the many questions that arose in the reorganization and that, apart from a memorandum filed in support of the proposition that attorneys for a creditors' committee are entitled to compensation in Chapter X, Leinwand filed only two other memoranda in the more than eight years of this case.[50] Chapter X, although liberal in terms of participation by committees and their representatives, does not contemplate that any or all of these parties would have a paid monitoring or general participatory role in the case. Such monitoring or general involvement must be incidental or preparatory to beneficial or productive results.

So far as can be determined, Leinwand's positive contributions were primarily as a disseminator of information to creditors and the rendition of assistance to the trustees in obtaining the required acceptances of the plan of reorganization by creditors. Such services did not involve unusual legal skills or large expenditures of time, and do not command a high rate or substantial amount of compensation.

Taking into account all of the above, the Court awards Leinwand a $10,000 final allowance in accordance with the recommendation of the S.E.C.

### 5. Thomas E. Zoda ("Zoda"), Secretary to the Unofficial Creditors' Committee

██ Zoda served as Secretary of the Unofficial Creditors' Committee until his death on April 17, 1974. His son requests $4,000 as a final allowance for Zoda's services, together with reimbursement of expenses of $311.28. The application shows that Zoda prepared and sent one informational letter to all creditors in October 1969, attended and prepared the minutes of two Creditors' Committee meetings in 1969, and generally communicated with various creditors. The application further recites that Zoda expended 90 hours in performing his duties as Secretary.

Both the Court and the S.E.C. find Zoda's particular contributions difficult to identify. Nominal compensation of $500 is awarded. The request for reimbursement of expenses of $311.28 is granted.

### F. Levin & Weintraub ("Levin") and Sullivan & Cromwell ("Sullivan") Attorneys for the Debtor

██ Although included together with the trustee and his counsel in Section 241 of the Bankruptcy Act, 11 U.S.C. § 641, as persons entitled to compensation, fees to attorneys for a debtor in Chapter X turn on the extent to which their services were beneficial to the estate or contributed to the proceedings.[51] The reason for this is clear. Although the Debtor has the right to be heard on all matters arising in a Chapter X case,[52] unlike the trustee and his counsel, it has no prescribed statutory functions or duties.

Levin and Sullivan have filed a joint application for final allowances as attorneys

---

48. *In re Hudson & Manhattan Railroad Co.*, 339 F.2d 114, 115 (2d Cir. 1964); *In re Meade Land & Development Co.*, 527 F.2d 280, 284 (3d Cir. 1975); *In re Webb & Knapp, Inc.*, 363 F.Supp. 423, 426 (S.D.N.Y.1976); *In re Polycast Corp.*, 289 F.Supp. 712, 717 (D.Conn.1968).

49. *In re Imperial "400" National, Inc.*, 432 F.2d 232, 239 (3d Cir. 1970); *In re Solar Mfg. Corp.*, 215 F.2d 555, 561 (3d Cir. 1954).

50. The files and Court records show that, exclusive of the fee memorandum, Leinwand filed but two short memoranda totalling 14 pages.

51. Footnote 12, *supra* and accompanying text.

52. Section 206 of the Bankruptcy Act, 11 U.S.C. § 606.

for the Debtor in this case. Levin requests $20,000 for services and $426 for reimbursement of expenses. Sullivan requests a fee of $15,000. Levin's time records show expenditures of 197.5 hours; Sullivan's show 205 hours.

Unlike all of the other applicants, Levin seeks no further payments from the estate (except for reimbursement of expenses) because of a $20,000 cash retainer received when it was retained by Hoe as special bankruptcy counsel prior to the filing of the Chapter X petition. In effect, Levin requests this Court to determine that the above retainer represents reasonable compensation for its services throughout the case, apparently recognizing that any sums in excess of what is found to be reasonable may be ordered returned to the estate under § 60.d. of the Bankruptcy Act, 11 U.S.C. § 96.d. and Chapter X Rule 10–217.[53]

In addition to the $20,000, Levin received $5,000 from Fasco, A. G. ("Fasco"), which retained Levin in connection with Fasco's unsuccessful bid for Hoe's Press Division. Levin's application discloses that this retention was informally authorized by Judge Ryan. The problem here, as the S.E.C. observes, is that Levin is now seeking payment from the estate as well for services it claims to have rendered in connection with the Press Division sale.[54] The Court views these services as having been paid for by Fasco, whose interest as a bidder was in conflict with the interests of Hoe and its creditors.[55] In any event, the Court feels that these services would not properly be chargeable to the Debtor.[56]

Levin's contribution to this case involved preparing and filing the Chapter X petition, preparing the order approving the Chapter X petition and appointing the trustee, and familiarizing the Court, the trustee and his counsel with Hoe's problems at the early stage. Otherwise, Levin merely attended court hearings and generally monitored the proceedings through its receipt of papers. This peripheral involvement tapered off to an average of less than 10 hours per year after 1970. Levin filed no briefs in this case on any of the issues arising from the reorganization.

In light of the mix of Levin's services, some of substantial benefit to the estate and some of little value, the Court awards it a final allowance of $12,000.[57] This is $4,000 in excess of the S.E.C.'s recommendation, which the Court feels takes insufficient account of the skilled work that was performed. Under the award, $8,000 is left to be returned to the estate. The Court grants Levin's request for reimbursement of expenses of $426.

Sullivan was general counsel to Hoe prior to the inception of these proceedings. Sullivan did not testify in support of its request at the final allowance hearing. It appears that Sullivan's contributions to this case were limited to preparing a draft of the Chapter X petition, which was submitted to

---

53. It should be mentioned that the S.E.C. in this case has expressed its strong disapproval of the practice of paying a substantial retainer to an attorney for a Chapter X debtor prior to the filing of the petition. "[C]ollection of the fee in advance on the assumption that beneficial services will be rendered in the future, not only deprives the debtor of the use of its money, but also the Court and the parties of the opportunity to examine an application before the estate is charged" (Memorandum of S.E.C. at 49 n.73).

54. Approximately 40 hours' worth.

55. A bidder for the property of a debtor seeks to acquire such asset at the lowest possible price and on the best terms possible, and, therefore, its interests are in conflict with the interests of the debtor and its creditors. *In re Chicago & West Towns Rys., Inc.*, 230 F.2d

364, 368–69 (7th Cir.), cert. denied, 357 U.S. 943, 76 S.Ct. 837, 100 L.Ed. 1469 (1956); *London v. Snyder*, 163 F.2d 621, 626 (8th Cir. 1947).

56. See, *In re Chicago & West Towns Rys., Inc.*, 230 F.2d 364, 368–69 (7th Cir.), cert. denied, 357 U.S. 943, 76 S.Ct. 837, 100 L.Ed. 1469 (1956); *London v. Snyder*, 163 F.2d 621, 626 (8th Cir. 1947).

57. After deducting the 40 hours expended on the Press Division sale, the award computes out to an hourly rate of approximately $75 per hour, which is reasonable considering that Levin has received $5,000 from Fasco and has had use of a $20,000 retainer for approximately eight years.

Levin for review and revision; familiarizing the trustee and his counsel with Hoe's problems; and, at the request of Judge Ryan, remaining as counsel of record in the various lawsuits against Hoe until the trustee's counsel could analyze the cases and take over their defenses.

Those services relating to the familiarization of the trustee and his counsel were of assistance to the administration of the estate at its inception. A significant portion of Sullivan's services, however, was expended in connection with various court hearings at which no briefs were filed or positions taken.

On balance, the court awards Sullivan a final allowance of $7,500, as recommended by the S.E.C.

G. *Wolf Popper Ross Wolf & Jones ("Wolf Popper"), Attorneys for Plaintiffs in Certain Stockholder Derivative Actions Brought on Behalf of Hoe*

▆ Wolf Popper requests $20,000 as counsel fees and $262.34 for reimbursement of disbursements in connection with services rendered on behalf of Hoe in two stockholders' derivative actions. One action was brought in federal court and the other in state court. About 225 hours are claimed to have been expended by Wolf Popper and its co-counsel Abraham Glickman and Moldover, Hauser & Strauss in furtherance of these actions.

Both of these actions were commenced shortly before the inception of the Hoe Chapter X case and after a number of shareholder actions were commenced against Hoe. The federal action was commenced on May 28, 1969 [58] and the state action on June 18, 1969. [59] These actions were stayed by the order of July 9, 1969 approving Hoe's Chapter X petition. The trustee instituted his own lawsuit against

Hoe's former management and auditors which, as indicated above, was settled together with the shareholder actions, resulting in a recovery of $2.1 million by the Hoe estate. However, in order to encompass the derivative actions within the "global settlement," the trustee, James B. Kilsheimer III, was substituted as plaintiff and Townley & Updike, trustee's special counsel, was substituted for Wolf Popper as attorney for plaintiff. In that connection, it was agreed and stipulated on March 27, 1974 that Wolf Popper would be entitled to file a fee application with the Chapter X court.

Wolf Popper urges that it laid the foundation for the action later prosecuted by the trustee. This assertion was disputed at the November 11 hearing, however, by the trustees and special counsel, who testified that applicants' services were of no benefit or assistance to the litigation and settlement. The testimony does indicate, however, that Wolf Popper's pleadings were reviewed by special counsel and that Wolf Popper and Abraham Glickman were in fairly regular communication with the trustee and his counsel regarding the prosecution of the claims against Hoe's management and accountants. Glickman, it should be noted, did not keep contemporaneous time records.

The S.E.C. has recommended denial of the application in its entirety. The Court is of the view, however, that the work performed by applicants was of some, if slight, benefit in the preparatory stages of the trustee's action. The Court therefore awards applicants, collectively, an allowance of $5,000. Their request for reimbursement of expenses is also granted in the amount of $262.34.

*Summary*

For the reasons stated, petitioners are awarded final allowances for services performed in the Hoe reorganization as follows:

| Applicant | Final Allowance | Interim Allowances Previously Paid | Balance Due | Disbursements |
|---|---|---|---|---|
| James B. Kilsheimer, III | $ 165,000 | $ 27,500 | $ 137,500 | $ —0— |
| Robert M. Corrao | 285,000 | 192,855 | 92,145 | —0— |
| Winthrop, Stimson Putnam & Roberts | 2,500,000 | 933,720 | 1,566,280 | 40,177.29 |

**58.** *Selzer v. Stanton,* 69 Civ. 2332 (S.D.N.Y.). **59.** *Selzer v. Gordon* (N.Y.Sup.Ct.1969).

| Applicant | Final Allowance | Interim Allowances Previously Paid | Balance Due | Disbursements |
|---|---|---|---|---|
| Townley & Updike | 450,000 | 195,720 | 254,280 | 1,522.42 |
| S. D. Leidesdorf & Co. | 680,335 [60] | 470,000 | 210,335 | 12,484.53 [61] |
| Harold P. Seligson | 100,000 | –0– | 100,000 | 135.00 |
| Ralph H. Haas | 3,500 | –0– | 3,500 | 280.61 |
| Irving H. Isaac | 1,000 | –0– | 1,000 | –0– |
| Leinwand, Maron, Hendler & Krause | 10,000 | –0– | 10,000 | –0– |
| Thomas E. Zoda | 500 | –0– | 500 | 311.28 |
| Levin & Weintraub | 12,000 | 20,000 [62] | (8,000) [63] | 426.00 |
| Sullivan & Cromwell | 7,500 | –0– | 7,500 | –0– |
| Wolf Popper Ross Wolf & Jones | 5,000 | –0– | 5,000 | 262.34 |
| Totals | $4,219,835 | $1,839,795 [64] | $2,380,040 | $55,599.47 |

The aggregate net allowances awarded thus far (pending the submission of further papers by S. D. Leidesdorf & Co.) represent slightly less than 14 percent of the $17 million value of the estate (approximately three-tenths of a percentage point above the recommendation of the S.E.C.). The Court is satisfied that petitioners have been accorded fair and reasonable compensation within the limitations of Chapter X practice, and that the interests of Hoe and those of its creditors and shareholders have been adequately protected.

Trustee's counsel is directed to file a proposed judgment order within thirty (30) days hereof.

SO ORDERED.

## SUPPLEMENTAL OPINION AND ORDER

1. Ralph H. Haas, Chairman of R. Hoe's Class A Stockholders' Committee, with the support of Harold P. Seligson, counsel to the Committee, has applied for reconsideration of his final allowance of $1,500. His application, timely received, is treated by the Court as a motion to amend the judgment pursuant to Rules 52(b) and 59, F.R. Civ.P. Haas had sought compensation of $7,500 for a claimed 445 hours of time expended on behalf of the Debtor; however, his actual time records reflected the expenditure of only 148.5 hours. The Court adheres to its original determination denying an award of fees for the approximately 296 hours for which time records were not kept.

However, the Court has had occasion to re-examine the value of Haas' recorded time on the basis of the receipt of a letter from Harold P. Seligson. Seligson represents that Haas was in fact of considerable value to him as a consultant, stressing that he often had occasion to utilize Haas' experience in regard to real estate matters. Taking into account Seligson's "earnest" plea on Haas' behalf for an increase in his final allowance, as well as Haas' long and devoted service to the Class A Stockholders of R. Hoe, the Court, in its discretion, increases his award to $3,500.

2. The Opinion and Order of July 25, 1978 is hereby amended *nunc pro tunc* to delete the first sentence of the second full paragraph on page 512 and to substitute the following:

"Insofar as its legal services are concerned, the Court is in agreement with

---

60. This figure represents tentative final compensation for Leidesdorf for the period July 22, 1969 through September 16, 1977. As noted in the text at 509, the Court will consider the award of additional compensation to Leidesdorf upon submission of supplemental papers.

61. Leidesdorf may apply for additional disbursements for the period subsequent to September 16, 1977. Text at 509.

62. Cash retainer.

63. Levin must return $8,000 to the estate.

64. Including the $20,000 retainer paid Levin.

the S.E.C. that Leinwand played an extremely limited role."

SO ORDERED.