## In re GENERAL OIL DISTRIBUTORS, INC., et al., Debtors.

### Bankruptcy No. 882–80516–20.

United States Bankruptcy Court, E.D. New York, at Westbury.

July 18, 1985.

Myron Trepper, Levin, Weintraub & Crames, New York City, for debtors.

Glenn B. Rice, Otterbourg, Steindler, Houston & Rosen, P.C., New York City, for Creditors' Committee.

Steven L. Cohen, Weisman, Celler, Spett, Modlin & Wertheimer, New York City, for Southville and Wechters individually.

Brad Eric Scheler, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Sun Refining & Marketing Co.

Gerard Hanson, Brener, Wallack & Hill, Princeton, N.J., for Kerr McGee Corp.

Craig Olsen, Coffey, McHale, McBride, Olsen & Shooltz, Melville, N.Y., for Crown Central Petroleum Corp.

Samuel D. Rosen, Milgram, Thomajan, Jacobs & Lee, P.C., New York City, for Horizon Products Co.

Stephen R. Kaye, Proskauer, Rose, Goetz & Mendelsohn, P.C., New York City, special counsel for debtors.

George Colin, Baer, Marks & Upham, New York City, for Gulf Oil Corp.

## DECISION AND ORDER

ROBERT JOHN HALL, Bankruptcy Judge.

The court has before it the applications of various entities seeking compensation and/or reimbursement of expenses from the Chapter 11 estates of General Oil Distributors, Inc. ("General Oil"), Inwood Petroleum Corp., Wechter Petroleum Corp., and Southville Industries, Inc. (collectively referred to herein as "the debtors"). Gulf Oil Corp. ("Gulf") and Crown Petroleum Corp. ("Crown"), as unsecured creditors of General Oil, have filed detailed objections to several of the applications. In addition, the debtors have responded to the fee applications by filing "recommendations" setting forth only the dollar amounts the debtors believe that the applicants should receive.

 In considering the fee applications, this court will utilize the "lodestar" approach to fee setting, a mechanism first adopted in this circuit in *Furtado v. Bishop*, 635 F.2d 915, 919–20 (1st Cir.1980). The "lodestar" is the product of "[t]he number of hours reasonably expended [multiplied] by a reasonable hourly rate." *Id.* (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C.Cir.1980)). Inherent in the determination of whether the number of hours expended and the hourly rate are reasonable are considerations including:

(1) the nature of the services rendered;

(2) the difficulties and complexities encountered;

(3) the results achieved;

(4) the size of the estate and the burden it can safely bear;

(5) duplication of services;

(6) professional standing, ability and experience of the applicant;

(7) fairness to each applicant; and

(8) the cost of comparable services other than for a bankruptcy case.

*See* 11 U.S.C. § 330; *In re Sapolin Paints Inc.*, 38 B.R. 807, 810, 11 B.C.D. 875, 876 (Bankr.E.D.N.Y.1984); *see also Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974). The Supreme Court has recently instructed courts to begin their determination by multiplying the hours reasonably spent by a reasonable hourly rate, and then where appropriate, to increase or decrease the product by considering further the subjective factors out-

lined above. *See Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 1939–40, f.n. 9, 76 L.Ed.2d 40 (1983). The lodestar approach requires that the applicants keep detailed records of both the amount of time spent and the manner in which it was spent. *Sapolin Paints, id.* Uncertainties arising due to poor record-keeping or vague applications will be resolved against the applicant. *See New York State Ass'n for Retarded Children v. Carey*, 544 F.Supp. 330, 338 (E.D.N.Y.1982).

## I

The court will first address the applications of the attorneys and the accountants for the creditors' committee and the debtor, which are the usual entities submitting fee applications in a reorganization proceeding.

### A. *The Otterbourg Application*

The law firm of Otterbourg, Steindler, Houston & Rosen ("Otterbourg"), counsel to the section 1102 unsecured creditors' committee of General Oil, seeks compensation pursuant to section 330 of the Bankruptcy Code for professional services rendered and reimbursement for expenses incurred. Specifically, Otterbourg requests $372,509 in compensation, inclusive of a 30% bonus, and $19,789.68 for reimbursement of expenses.

■ The 30% bonus request, amounting to $85,963.62, is hereby rejected. An application for fees should be closely scrutinized to prevent overcharging, and the burden of proof on all fee matters is on the applicant. *In re Liberal Market, Inc.*, 24 B.R. 653, 657–58 (Bankr.S.D.Ohio 1982). Otterbourg states that its 2½ year and 2,153 hour investment in representing the creditors' committee helped produce excellent results for the unsecured creditors. No such excellence is, however, readily apparent from any of the voluminous documents connected with this proceeding. Neither has such excellence been attested to by other parties involved herein. In any event, Otterbourg would have to demonstrate something beyond excellence in the representation of its clients to warrant a bonus. The court is familiar with these proceedings and counsel's substantial activity therein, and yet, just as counsel has not articulated a concrete basis therefore, the court cannot cite anything extraordinary in connection with Otterbourg's "investment" to justify awarding a bonus.

■ Other than with regard to the bonus, the only objection to Otterbourg's request was made by Gulf. In addition to asserting that a bonus was completely unwarranted, Gulf contends that the basic fee should be reduced because the results obtained were in many respects "poor". As an example, Gulf cites the fact that the bulk of payments provided for by the plan are contingent payments over an 11 year period. In addition, Gulf points out that Otterbourg had the assistance of the numerous attorneys who devoted much of their time to committee work, many of whom are seeking fees to be paid from the estate. Although the court believes that Otterbourg's work herein was not so extraordinary as to warrant a bonus, Otterbourg's role is nevertheless deserving. Accordingly, in the absence of any particular objections to the basic fee and expenses requested, the court authorizes compensation in the amount of $286,545 (Otterbourg's fee request minus the $85,963 bonus) and $19,-789.68 reimbursement for expenses.

### B. *The Levin Application*

The firm of Levin & Weintraub & Crames ("L & W & C"), counsel for the debtors, seeks $480,000 in compensation and $21,279.44 as reimbursement for expenses incurred in connection with the rendering of its legal services. Although the reimbursement request is reasonable, the $480,000 compensation fee, which broken down amounts to a $201 hourly rate, is not. Accordingly, L & W & C agreed at oral argument to accept the debtor's recommendation that the fee be reduced to $360,-000.00. Such a reduction satisfied all objections raised with respect to L & W & C, and therefore, compensation will be set at $360,000.00 and expenses at $21,279.44.

## C. *The Stryker Application*

By order of this court dated August 12, 1982, the debtors in possession were authorized to retain the firm of Stryker, Tams & Dill ("Stryker") as special tax counsel. Pursuant to section 330, Stryker now seeks $5,756 in compensation for services rendered and $254.37 for expenses incurred in connection with the rendering of such services. The work performed by Stryker appears to have been most successful. The request is without opposition, appears reasonable, and is therefore granted in all respects.

## D. *The Proskauer Application*

On May 17, 1982, this court authorized Proskauer Rose Goetz & Mendelson ("Proskauer") to act as special corporate and litigation counsel for the debtors. Pursuant to section 330, Proskauer now seeks $758,477 in compensation plus $37,607.53 for reimbursement of expenses.

The Proskauer firm having requested by far the largest amount of compensation, has consequently drawn the most objections. Gulf filed objections to Proskauer's request based primarily on a comparison of the $758,477 fee requested to the results achieved by Proskauer's services. Gulf points to Proskauer's recovery of approximately $690,000 in its collection efforts of the debtor on various receivables, a sum less than that requested in fees. As to the portion of the fee requested in connection with General Oil's action against Horizon Products Co. ("Horizon"), Gulf asserts that the fee request of $535,458.75 in connection with the Horizon action should be reduced dramatically in light of its outcome. In the Horizon action General Oil sued Horizon for goods sold and delivered in the amount of approximately $1 million. Horizon claimed as defense an offset of the $1 million against a $2 million indebtedness owing from General Oil and Refining, a company formed by one of General Oil's principals. Horizon took the position that General Oil was responsible for the debt owed from General Oil and Refining and interposed a counterclaim for $2 million.

The final outcome of the litigation was that General Oil succeeded in its $1 million goods sold and delivered cause of action but Horizon obtained judgment for $2 million on its counterclaim.

With respect to the litigation other than in the Horizon action, Gulf asserts that most of the matters were routine collection cases, requiring the work of only junior personnel. As an example, Gulf cites Proskauer's request of about $39,000 for work on the Kings County Transportation Corporation matter. Gulf contends that General Oil could have as easily obtained a default judgment and collected thereon by employing counsel junior to Lester Kirshenbaum, a then senior associate whose time constituted half of the attorneys' time spent on the matter.

In addition to Gulf's objection, Crown filed an affidavit objecting to Proskauer's application. In its affidavit, Crown indicated it had no opposition to the fee request to the extent it related to an action between Crown and the debtors, because Crown believed that the action was difficult and complex, and involved managing voluminous documents. Crown contended, however, that with respect to the description of services characterized as "general" in Proskauer's application, it is impossible to discern whether the activity included therein is duplicative of the activity listed in the description of services characterized by the various litigation, including the category concerning the litigation with Crown. As an example, Crown cites the "special investigation" listing as including discovery conducted in the Crown litigation and referred to in the Crown litigation category.

Crown's primary objection is in connection with the Horizon action. Crown asserts that during the litigation some creditors voiced the opinion that a summary judgment motion would be unsuccessful, and that time would best be spent preparing for trial. Crown points out that $87,000 in fees were attributed to the motion, and that an additional amount of approximately $150,000 was attributable to trial preparation. Crown asserts that some of

these charges are duplicative, unnecessary and unwarranted. Crown emphasizes that the earlier Crown litigation must have provided Proskauer with most, if not all, of the information necessary to confront the Horizon allegations.

Finally, Crown contends that the amount of time spent subsequent to the jury verdict was excessive by reason of the amount of liability to which the debtors were actually subject to under the reorganization plan. Crown specifies that with the plan providing for a 60% distribution to unsecured creditors, and Horizon's claim being liquidated for approximately $1 million, that the liability was actually only slightly above the fees requested by Proskauer for services rendered in the Horizon action.

At oral argument, Crown indicated that it would withdraw its objection if Proskauer would reduce its fee by the summary judgment amount of $87,000 plus one half of the remaining amount related to the Horizon Action (about $200,000), for an approximate total reduction of $290,000.

At oral argument the debtors for the first time presented objections to Proskauer's application. The debtors reiterated some of those presented by Gulf and Crown, but emphasized that the results of Proskauer's efforts actually rendered a substantial net loss, considering the net verdict in favor of Horizon for $1 million. The debtors assert that Proskauer should be limited to the $120,000 interim fee Proskauer has already received. They point out that for successfully litigating the Horizon action, Horizon's attorneys only billed their clients for $240,000.

Proskauer responded to the debtors' oral objections by first noting that the court's order setting the hearing on the application, which was submitted by the debtors, required any objections to be filed with the court and served upon the person whose interest would be affected prior to the hearing. Proskauer contended, therefore, that the debtors failed to timely file objections to which it could properly respond.

Proskauer represented that attorneys fees were kept to a minimum, as reflected in the fact that less than 10% of the time was spent by partners and a substantial amount of the services were performed by legal assistants. As a result, Proskauer states that its blended hourly rate was kept to about $105 per hour and its average attorneys hourly rate was about $127, one of the lowest of the applications.

Proskauer observed that although there may have been some misgivings expressed about the motion for summary judgment in the Horizon action, the creditors' committee ultimately offered its approval. Similarly, after the trial the debtors and the committee supported the appeal. Finally, Proskauer emphasized the complexity of the Horizon action, the Crown litigation, and several other matters it undertook.

■ Applying the lodestar approach the court turns first to the hourly rates used by Proskauer to determine its fee. Upon review of the hourly rates applied by Proskauer the court finds that they are reasonable. As indicated in its application, the average hourly rate for partners was $209.60, for associates $116.63, and for legal assistants $49.67. At first blush, the court might be inclined to reduce the rate charged for partners' time, but it declines to do so in light of the facts that partners' time constituted only 9.6% for the total time expended and that much time has elapsed since the services were performed without payment having been made.

The court believes, however, that a 30% reduction in the 7,169 amount of hours for which Proskauer asks to be compensated is warranted. A percentage reduction in acknowledgement of the general force of valid objections in the hours allowed has recently been approved by the Second Circuit. *See New York Ass'n for Retarded Children v. Carey,* 711 F.2d 1136, 1142 (2d Cir.1983). In *New York Ass'n for Retarded Children,* the court approved the district court's percentage reductions upon the district court's consideration of duplicative claims, excessive claims for certain tasks, inadequate detail in documentation, and inconsistencies between the amount of

time claimed by different attorneys for similar tasks. *Id.* The court stated that the district court was acting within its discretion when it made reductions. *Id.* at 1146. The court recognized that "it is unrealistic to expect a trial judge to evaluate and rule on every entry in an application." The court continued that percentage cuts are "a practical means of trimming fat from a fee application." *Id.*

Several aspects of the Proskauer application indicate that the number of hours claimed was inaccurate and that the number of hours actually expended was excessive, or alternatively, that the application is lacking in detail sufficient to allow the court to make an adequate assessment. The voluminous computer time sheets submitted by Proskauer indicate that that law firm made every time entry in segments of quarter-hours. Thus, no telephone conversation or letter dictation is listed as requiring less than 15 minutes, 30 minutes, 45 minutes, etc. Where such matters, as here, account for a great number of entries, "an arbitrary assumption of this character, although understandable as an efficiency measure, tends to overstate hours...." *Sapolin*, 38 B.R. at 813. As the court in *Sapolin* observed, "common experience tells us many telephone calls take substantially less than 12 minutes. Indeed, the telephone company's rates are predicated upon the premise that most telephone calls terminate within three minutes." *Id.* at 814. The two applications which were reduced in *Sapolin* involved entries recorded in segments of 12 minutes for one and 6 minutes for the other. By comparison, the 15 minute entries in the Proskauer application call for a substantial reduction based upon the inherent exageration resulting from such large estimations.

A second problem with the Proskauer application also relates to the manner in which entries were made on the computer time sheets. The entries give the very minimal in information about the work relating thereto. The following constitute entries under the "Description" column, and are examples of the many instances in which practically no information other than the type of activity is listed:

CONF SK
TEL TREPPER
DICT LET TREPPER
FILES
MEMO
DISC W/LK
MTG LMK
RESEARCH

Furthermore, many of the above entries attempted to account for several hours of work. The few entries which were more descriptive usually stated only the general topic to which the activity related, such as:

CONF JR RE STATUS OF SETTLE-
MENT
TEL LP RE CASES
CONF NS & LP RE MOTION

Proskauer's computer time sheets do not allow the court to evaluate the nature or substance of the services. The court is unable, for example, to determine whether phone calls and letters involved truly legal services or whether they should be compensated at a somewhat lower rate. *See Sapolin*, 38 B.R. at 811. In addition, about half of the entries include only the total time expended upon several matters, thus preventing the court from assessing the amount of time spent upon a particular matter. The following entries are examples:

| | |
|---|---|
| TRAVEL TO/FM INWOOD; REV DOCS; MTGS PW, O. FELD, LMK | 6.50 hrs. |
| MEMO TO LMK; MTGS LMK; CORCORAN DEP; DICTATE NOTES | 5.00 hrs. |

Similarly, the court is unable to evaluate whether conferences involved merely informing other attorneys of the status of matters, activity from which the court might discern the extent services were duplicative. In any event, it is well-settled that uncertainties arising because of inadequate records must be resolved against the applicant. *New York State Association for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1142 (2d Cir.1983) (citing *EEOC v. Sage Realty Corp.*, 521 F.Supp. 263, 273–74 (S.D.N.Y.1981)).

Aside from the difficulty in assessing duplication of services presented by the application, certain aspects of the application affirmatively indicate unnecessary duplication was common. In cases involving multiple attorneys or a large amount of hours claimed, "an across-the-board reduction is a necessary but fair expedient to correct for excessive or duplicative hours." *New York State Association for Retarded Children, Inc. v. Carey*, 544 F.Supp. 330, 339 (E.D.N.Y.1982), *rev'd on other grounds*, 711 F.2d 1136, 1146 (2d Cir.1983) (trial judge may decline to compensate hours spent by collaborating lawyers and may limit hours allowed for specific tasks; such decisions are best left to discretion of trial court). The Proskauer application contains by far the largest amount of claimed hours; it requests compensation for approximately 7,200 hours expended over two and one-half years. More importantly, however, the number of attorneys and legal personnel involved on behalf of the Proskauer firm leads to the conclusion that a portion of the 7,200 hours involved duplication. The court must consider the likelihood that attorneys acting jointly may be charging the estate double for the same service. *See Cle-Ware Industries, Inc. v. Sokolsky*, 493 F.2d 863, 874–75 (6th Cir.1974); *Sapolin*, 38 B.R. at 811; *In re Crutcher Transfer Line, Inc.*, 20 B.R. 705, 710 (Bankr.W.D.Ky.1982). The Proskauer application indicates that *32* attorneys were involved in representing the debtor, 21 of which expended a substantial number of hours each. In addition, Proskauer utilized *22* legal assistants. The application demonstrates numerous meetings, conferences and telephone calls between these attorneys and assistants. Undoubtedly, much of the time expended therein and elsewhere includes the time necessary to educate each attorney about the case multiplied by the number of attorneys. The application indicates that no method was utilized to account for such time or to minimize its effects. Although the court appreciates the complexity of some of the matters undertaken by Proskauer, the court believes such a large number of attorneys and assistants was unwarranted, and that for this and the other reasons above at least a 30% reduction in the compensable hours is called for.

Up to this point the court has essentially derived the lodestar figure: 70% of the 7,169 hours multiplied by the overall average hourly rate request of $105.80, yielding a product of $530,936.14. After determining the lodestar amount, the trial court then has discretion to raise or lower the fee award in light of subjective factors. *See New York Ass'n for Retarded Children*, 711 F.2d at 1140. As mentioned above such subjective factors include the results achieved, the size of the estate and the burden it can safely bear, and the cost of comparable services other than for a bankruptcy case. Consideration of these factors with respect to the Proskauer application convinces the court to reduce the lodestar amount by an additional 10%.

Seven months after Proskauer was retained, in a decision awarding Proskauer an interim fee of $120,000.00 plus $6,952.50 in expenses, the court warned that one of the most significant factors in its determination of an ultimate award of compensation would be the results attained. *In re General Oil Distributors, Inc.*, No. 882–80516–20, slip op. at 5 (Bankr.E.D.N.Y. Dec. 24, 1982) (quoting *In re Pennsylvania Tire & Rubber Co.*, 19 B.R. 124, 127 (Bankr.N.D. Ohio 1980)). The court cannot ignore the general import of the objections raised by several creditors and the debtor as to the results achieved. Whichever way we compare the outcomes of the litigation Proskauer conducted with the fee requested, a further adjustment is necessary to bring the fee within reason. Considering total cash recovered as a result of Proskauer's efforts, we can compare the $690,000 amount to the $758,477 requested as fees. On this basis a reduction seems self-evident. Including the Horizon action, the situation becomes more grave. Proskauer recovered $690,000 cash, obtained summary judgment on the goods sold and delivered claim for $1 million against Horizon, but had a $2 million negligence judgment

entered against its client. In this perspective, Proskauer's efforts yielded a substantial loss of about $310,000. There being many sides to every story, however, the court notes that a third perspective is available here. The debtors stood to recover over $1,690,000 (the $1 million Horizon claim and over $690,000 recoverable in the other collection cases) and possibly successfully defend a $2 million counterclaim—a total spread of $3,690,000. With such a large amount of money subject to litigation, $758,477 of legal services rendered may not be unusual. The essential difference between these perspectives is the benefit of hindsight in the former two viewpoints. Proskauer should not be penalized for their lack of such hindsight at the time the services were rendered. Nevertheless, to a minor extent the court must consider the results achieved and the fact that the litigation conducted by Proskauer, particularly the Horizon action, was largely unsuccessful.

Moreover, with respect to the Horizon action, the court is able to consider the cost of comparable representation. The law firm of Milgrim Thomajan Jacobs & Lee, attorneys for Horizon, were more successful in the Horizon litigation and yet charged Horizon only approximately $240,-000. For the Horizon action, Proskauer requests fees in the amount of $533,458.75. The difference between the fees charged, in addition to the less favorable results achieved, are the subjective factors warranting a reduction in the lodestar amount.

Finally, the court must consider whether the estate can safely bear the fee award requested, and the fairness to other applicants and to creditors of awarding a fee which risks placing the debtor back in bankruptcy. Professionals working in the reorganization process should always consider the propriety of saddling the estate with huge administration claims where such burden may destroy a debtor's prospects for reorganization. Several creditors as well as the debtor have raised concerns in this regard, yet none have offered evidence with respect to the debtor's ability to carry the fees. Gulf, however, which had also objected to Proskauer's interim fee request, has indicated that the plan provides for the creditors to receive noncontingent payment of only $550,000 on $10 million of claims, with other payments contingent on the profitability of the debtor. The glaring disparity between the $550,000 certain payment to creditors and Proskauer's fee request of $758,477 constitutes the final factor the court will consider.

Taking into account the results achieved by Proskauer's efforts, the fact that Horizon was charged less than half that charged by Proskauer for comparable but less successful services, and the modest size of the estate compared to the fee requested by Proskauer, the court believes a further reduction of 10% of the lodestar amount of $530,936.14 (a $53,093.61 reduction) is necessary. This figure represents less than a 7% reduction of the $758,477 originally requested. Proskauer is hereby awarded $477,842.53 for compensation and $37,607.53 for expenses.

## E. *The Ernst & Whinney Application*

The accounting firm of Ernst & Whinney seeks $112,464 in compensation and $8,011.35 in reimbursement of disbursements. Ernst & Whinney served as accountants for the creditors' committee. Since no objection to these figures have been raised and the sums appear reasonable, the application is granted in its entirety.

## F. *The Main Hurdman Application*

Pursuant to section 330, the accounting firm of Main Hurdman seeks $291,891 in compensation and $5,912 for reimbursement of expenses incurred. Main Hurdman served as accountants for the debtor in possession. No opposition has been filed to Main Hurdman's application and its fee an reimbursement requests appear to be reasonable. Therefore the request is hereby granted in its entirety.

## II

 The remaining entities seek compensation and/or reimbursement of ex-

penses pursuant to section 503(b) of the Code, which provides in pertinent part:

> (b) After notice and a hearing, there shall be allowed, administrative expenses, ... *including* —
>
> \* \* \* \* \* \*
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by—
>
> \* \* \* \* \* \*
>
> (D) a creditor, ... or a committee representing creditors ... *other than a committee appointed under section 1102* of this title in making a substantial contribution in a case ...;
>
> \* \* \* \* \* \*
>
> (4) reasonable compensation for professional services rendered by an attorney whose expense is allowable under paragraph (3)....

11 U.S.C. § 503(b) (1982). (Emphasis added.)

Gulf objects to the applications made by the creditors seeking reimbursement of expenses pursuant to paragraph (D), as well as to the applications for compensation made by attorneys and accountants of those creditors pursuant to paragraph (4).

Gulf argues that the language in paragraph (D), which states that a committee "other than a committee appointed under section 1102" is entitled to reimbursement of expenses, should be interpreted so as to allow non-statutory committees to recover but, at the same time, to deny recovery to the statutorily appointed committee. Gulf continues that since statutory committees are denied recovery, their members and their members' counsel are, by necessary implication, also excluded.

Although this "prohibitive" approach urged by Gulf has received judicial support in some jurisdictions, *see, e.g., In re Restaurant Systems,* 30 B.R. 32, 33 (Bankr.S. D.Fla.1983), other courts have taken a "definitional" approach—*i.e.,* that the words "other than a committee appointed under section 1102" were intended to permit reimbursement for expenses of credi-

tors' committees *in addition* to the committee appointed under section 1102, and not to exclude the section 1102 committee itself. *See, e.g. In re Labine,* 42 B.R. 883, 887–88 (Bankr.E.D.Mich.1984). However, under this "definitional" approach, statutory creditors' committees would have to satisfy the requirement in section 503(b)(3)(D) that the entity have made a "substantial contribution" in the case.

This court believes neither the prohibitive nor the definitional view is correct, but rather adopts the view set forth in *In re Global International Airways Corp.,* 45 B.R. 258, 12 B.C.D. 669 (Bankr.W.D.Mo. 1984). As Judge Pelofsky observed in *Global,* under the Bankruptcy Act creditors' committee expenses could be charged against the estate. *Id.* at 258–59, 12 B.C.D. at 670. Compensation was expressly provided for in Rule 11–29(c), which continued to be controlling under the Code until 1981, when the local rules for this district adopted the Interim Bankruptcy Rules and Forms. The Interim Rules, like the Rules of Bankruptcy Procedure which became effective August 1, 1983, but unlike former Rule 11–29(c), did not expressly provide that expenses of committees could be reimbursed. Rather Rule 2016 only sets forth the procedure for obtaining reimbursement of expenses, without indicating which entities are entitled to reimbursement. The advisory committee note, however, states that a committee is included within its provisions.

Once the new rules became effective, however, neither the statute nor the rule contained language specifically providing for reimbursement to statutory committees for expenses other than those related to the employment of professional persons. Nevertheless, as noted by the *Global* court, nothing in the legislative history evidences an intent to prohibit reimbursement of a statutory committee's expenses. 45 B.R. at 260, 12 B.C.D. at 671 (quoting exchange between Senators DeConcini and Dole in which the Senators noted with approval the practice of reimbursing this type of ex-

pense and agreed that the 1984 Amendments did not change the practice).

If anything, differences between the Act and the Code would suggest that Congress intended the practice to continue under the Code, and that perhaps the practice is essential to maintaining the scheme envisioned by the Code. As Judge Pelofsky observed:

In the Code Congress imposed heavy duties upon the committee of unsecured creditors. Having taken the court out of administration, the Congress had to have an expectation that the committee would participate in the reorganization process. Otherwise, no one would represent the unsecured creditors who, having already invested without recourse in the debtor, would be unlikely to continue to do so unless assured that continued efforts would not be at their own expense and thus represent additional investment for which there was little hope of recovery.

*Global*, 45 B.R. at 261, 12 B.C.D. at 671 (citing Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93d Cong. 1st Sess., pt. I 103–117, reprinted in App. 2 Collier on Bankruptcy (15th Ed.); 1 Collier on Bankruptcy Paragraph 6.01 (15th Ed.); House Report No. 95–595, supra, 3–4, 96–100, 104–105, 235–236.) The *Global* court concluded that section 503(b)(3)(D), instead of precluding reimbursement to section 1102 committees, merely establishes the tougher "substantial contribution" standard for reimbursement of non-statutory committees and those entities listed therein. Section 1102 committee expenses could be reimbursed upon the section 503(b)(1)(A) showing that the expenses were actual and necessary.

Even those courts that have interpreted paragraph (D) to exclude reimbursement for the statutory committee have indicated that logic and equity seem to demand a different result, and have therefore been unable to conjecture why Congress would have desired to permit recovery for non-statutory committees but summarily deny recovery for committees appointed under

section 1102. *See, e.g., In re Lyons Machinery Co.*, 28 B.R. 600, 602 (Bankr.E.D. Ark.1983). The effect of such an inconsistency would be to promote a shift away from the nonreimbursable statutory committee to the fully recoverable voluntary committee, thereby rendering meaningless almost the entire statutory mechanism which Congress explicitly provided for in Chapter 11 cases. *See In re Major Dynamics, Inc.*, 16 B.R. 279, 280 (Bankr.S.D. Cal.1981).

The court holds, therefore, that the expenses of the creditors' committee are indeed compensable if reasonable and necessary. As expressed by section 503(b)(3)(D) however, individual creditors will be reimbursed for expenses under 503(b)(3)(D), and their attorneys under section 503(b)(4), only upon a showing that the expenditure was made in connection with the rendering of a substantial contribution to the case.

Before scrutinizing those applications in which the applicants request fees and expenses for their "substantial contribution" to this case, it is necessary to set forth in detail, to the extent possible, what the term "substantial contribution" found in section 503(b)(3)(D) denotes. Section 503(b)(3)(D) is derived from sections 242 and 243 of the Bankruptcy Act. *See In re Jensen Farley Pictures, Inc.*, 47 B.R. 557, 12 B.C.D. 978, 980 (Bankr.D.Utah 1985); *In re Calumet Realty Co.*, 34 B.R. 922, 925 (Bankr.E.D. Pa.1983); *In re Interstate Stores, Inc.*, 1 B.R. 755 (Bankr.S.D.N.Y.1980).

The policy aim of allowing compensation for a creditor's efforts in substantially contributing to the case is to promote meaningful creditor participation in the reorganization process. *Calumet Realty*, 34 B.R. at 926. In accordance with this purpose, compensation should not be awarded where the services were provided solely in order to benefit the creditor. *Id.* Thus, an incidental benefit to the estate or the estate's creditors will not provide the basis for an award from the estate. For example, such nonreimbursable services undoubtedly include those rendered in prosecuting a creditor's claim. *See id.*

The court in *Jensen-Farley Pictures* carefully analyzed the legislative history of section 503(b)(3)(D) and the case law under its predecessor sections. 47 B.R. 557, 12 B.C.D. at 980–82. The precursor of the substantial contribution test was the "direct benefit" rule. 47 B.R. 557, 12 B.C.D. at 980. Under that rule, creditors were entitled to expenses and attorneys fees where services were rendered in order to benefit the administration of the estate or to devise a plan of reorganization, *and* where such services *directly benefited* the reorganization or the estate. *See id.* The cases decided under the direct benefit rule disallowed compensation where benefit to the estate or other creditors was merely incidental. *See* 47 B.R. 557, 12 B.C.D. at 981 (citing *In re Buildings Development Co.*, 98 F.2d 844 (7th Cir.1938)). Expressing a similar sentiment, the Second Circuit held that the services must have been *in furtherance* of the plan ultimately adopted. *In re Ulen & Co.*, 130 F.2d 303, 304 (2d Cir.1942). Similarly, the Second Circuit denied compensation where the services were only remotely related to the reorganization. *See Finn v. Childs Co.*, 181 F.2d 431, 440–41 (2d Cir.1950). The *Finn* court emphasized that "when such allowances are made they must be for work which 'directly contributes' to the reorganization...." *Id.* at 439. Thus, a creditor's attorney must ordinarily look to its own client for payment, unless the creditor's attorney rendered services on behalf of the reorganization, not merely on behalf of his client's interest, and conferred a significant and demonstrable benefit to the debtor's estate and the creditors. *See Jensen-Farley Pictures*, 47 B.R. 557, 12 B.C.D. at 982.

## A. The Crown Application

Crown, a member of the duly appointed creditors' committee, submitted an application for reimbursement of $1,239.13 of travel and out-of-pocket expenses incurred directly in connection with Crown's participation as a member of the section 1102 creditors' committee. The expenses involved in assembling the committee meetings are statutory committee expenses and are therefore governed by the reasonable and necessary standard as outlined above, and not by the substantial contribution standard. The sum requested for travel, meals, lodging, etc. incurred in attending creditors' committee meetings appears to be reasonable in all respects. The application is therefore granted in its entirety.

## B. The Sun Application

Sun Refining and Marketing Company ("Sun"), the chairman of the creditors' committee, likewise submitted an application seeking reimbursement of travel expenses incurred in attending creditors' committee meetings. Said sum of $900 appears reasonable and is therefore awarded in its entirety.

## C. The Fried, Frank Application

Fried, Frank, Harris, Shriver & Jacobson ("Fried, Frank"), attorneys for Sun, submitted an application requesting allowance of compensation for $67,859.50 and expenses for $1,948.13 pursuant to 11 U.S.C. § 503(b)(4). Fried, Frank contends that its assistance in connection with the debtors' formulation of a viable reorganization plan has rendered a substantial contribution to the case.

Fried, Frank's application does not contain time sheets nor a detailed recitation of the services allegedly constituting a substantial contribution. Fried, Frank merely submitted a narrative of "the more significant aspects" in relation to its role on the creditors' committee, stating that it would "unnecessarily burden this Court to describe in detail all of the services rendered by Fried, Frank, Harris, Shriver & Jacobson that have been of benefit...."

In Fried, Frank's narrative they represent that in connection with Sun's chairmanship and participation on subcommittees, it represented and assisted Sun and actively participated in all meetings, negotiations and deliberations. Fried, Frank further states that its contributions therein have resulted in a substantial benefit to the reorganization. By way of purported de-

tail, Fried, Frank stated that together "with the attorneys for the Creditors' Committee, [Fried, Frank] urged that an independent third party be retained to oversee the operation of the Debtor's businesses and investigate the various allegations concerning prior mismanagement of such businesses." In this regard, Fried, Frank states that it was active in *the search for and consideration of* candidates for the position of third party manager. In similar conclusive fashion, Fried, Frank represents that together with the attorneys for the creditors' committee, it urged the committee to insist that the debtors fund and secure the plan with the collective assets of the debtor and related non-debtor entities. According to Fried, Frank, it "is a matter of record that the compromises fashioned and embodied in the Debtors' confirmed chapter 11 plan ... is the result of the initiative undertaken by Sun and the members of the Creditors' Committee." The application is filled with statements in this vein which serve as the predicate for the periodic conclusions that "FFHS & J's diligence and expertise ... made a substantial contribution...."

Fried, Frank's application continues to describe generally how it participated in efforts to mediate and resolve controversies, and in negotiations in fashioning and agreeing upon all of the relevant provisions of the plan. In this latter activity, Fried, Frank mentions that it was an active member of the plan negotiating committee. Finally, Fried, Frank was active in the preparation of the debtors' disclosure statement.

Perhaps anticipating a concern which became apparent from the statements above, Fried, Frank represented that "the professional services for which compensation is sought were not duplicative of services rendered by the attorneys for and other representatives of the Creditors' Committee, other individual creditors and parties in interest herein."

Aside from Gulf's objections addressed to the various applications collectively, Gulf asserted that Sun acted merely as another member of the 11 member creditors' committee, and that its attorneys Fried, Frank acted only for the benefit of said member. Crown essentially echoed this sentiment with respect to Sun's capacity as chairman and member of the creditors' committee, but asserted that Fried, Frank did in fact do work over and above its own client's representation in connection with the plan negotiating committee. Crown, which voiced strong objections to the applications made by various creditors' attorneys, asserted both in its written papers and at oral argument that in this specific capacity Fried, Frank made a substantial contribution, and to the extent services were rendered in this respect, Fried, Frank was deserving of compensation from the estate. Crown indicated, however, that based on deficiencies in Fried, Frank's application, it was unable to determine specifically what amount should be paid. Nevertheless, Crown represented that after discussions with Amoco's representative, they would not object to a fee in the vicinity of twenty-five thousand dollars. No other objections were raised to Fried, Frank's application, but it is interesting to note that the debtors, who recommended that the other creditors' attorneys who submitted applications receive nothing from the estates, expressly took "no position with respect to" Fried, Frank's application.

Were it not for the representation of Crown (and vicariously Amoco) that Fried, Frank did in fact do work over and above representation of its own client's interest, the court would be inclined to deny any compensation to Fried, Frank. As Fried, Frank indicated, due to its concentration of effort in nonlitigation activities, the court has little first-hand knowledge of their efforts. Furthermore, Fried, Frank's application does little to help its cause, in that it lacks the requisite detail to enable the court to assess whether it made a substantial contribution, and if so, to what extent. Nevertheless, the position of Crown, Amoco and the debtors with respect to Fried, Frank's application, in light of those par-

ties' adverse positions with respect to the other applications submitted by creditors' attorneys, convinces the court that indeed Fried, Frank rendered a substantial contribution to this case, but only with respect to the services performed with respect to the plan negotiating committee. Certain statements in Fried, Frank's application convey serious doubts that the other services were actually necessary or that they were not merely incidental to Fried, Frank's representation of Sun. For example, Fried, Frank states that it actively participated in the search for the third party manager. The court is aware of no justification to charge the estate a multiple of attorneys' fees for what clearly appears to be nonlegal work which should have been conducted by committee members. In addition, its candid statement that the substantial indebtedness owed to Sun by General Oil necessitated active participation "in virtually every aspect of General's chapter 11 case and the reorganization process" leads to an inference that a large portion of such work was performed solely on behalf of Sun. Based on Crown's recommendation and the information conveyed in Fried, Frank's application, the court hereby awards the sum of $20,000 as total compensation and reimbursement of expenses.

## D. *The Milgrim Application*

 Milgrim Thomajan Jacobs & Lee ("Milgrim"), as attorneys for Horizon, seeks compensation of $28,620.88, inclusive of a 25% bonus, plus reimbursement of disbursements in the amount of $2,072.64, for Horizon's alleged substantial contribution to the reorganization of the debtors. Milgram asserts that its efforts in prosecuting the trustee motion were instrumental in disclosing misconduct of the debtors' management and in increasing the distribution to unsecured creditors under the debtors' plan.

In opposition to Milgrim's request, Crown disputes Milgrim's assertion that its services rendered worked a substantial contribution, and asserts that whatever action Milgrim took was solely on Horizon's behalf. Crown indicates that Horizon was not a member of the committee until the very end of the chapter 11 case, and that the evidence of questionable proceedings had already been before the court in connection with the retention of the third party manager. It is also Crown's position that the concessions from the debtor for which Milgrim takes credit, were actually the result of pressures from the creditors' committee. At oral argument, Myron Trepper, Esq., one of the debtors' bankruptcy attorneys, stated that some concessions were remotely connected with Horizon's trustee motion. Mr. Trepper explained, as the court is well aware, that the trustee motion delayed for several months consideration and confirmation of the debtors' plan of reorganization. During these months the debtors' businesses profited considerably, thereby causing the creditors to believe that the debtor was able to pay a greater dividend.

Based on the fact that Milgrim's application contains the same type of generalities and the other similar deficiencies as the Fried, Frank application, and based upon the court's own perception of the intention of the trustee motion and the tenuous causal relationship between the motion and the augmentation of the estate, the court declines to award Milgrim any compensation from the estate. At the time the trustee motion was commenced, an appeal was pending between Horizon and General Oil before the Second Circuit over the outcome of the Horizon action. It appears likely, given the nature of the settlement of the trustee motion, that the motion was instituted at least partly as a leverage device to favorably affect the resolution of the appeal. In any event, the court's doubts in this regard must be resolved against Milgram due to its vague and conclusory application. The lack of specificity therein prevents the court from assessing whether Milgrim was working solely on Horizon's behalf or whether Milgrim was working for

the protection of the creditors in general and the reorganization goal. Certainly, the fact that most, if not all of the information concerning the Wechter's misbehavior had previously been acted upon by the creditors' committee, leads to an inference that any slight additional information derived from the trustee motion was entirely incidental. Similarly, the fact that the trustee motion delayed confirmation and thereby resulted in increased profits inuring to the benefit of the estate, is only indirectly related to Milgram's services.

### E. *The Royal Petroleum Application*

■ Royal Petroleum Corp. ("Royal") seeks $1,088.99 for reimbursement of expenses allegedly incurred during its involvement as a member of the creditors' committee. Royal submitted a two page application in which its representative stated he traveled to New York City for a creditors' committee meeting as well as for two unrelated purposes. The itemized breakdown of Royal's expenses involved a request for plane fare from Oklahoma City (Royal's hometown) to Syracuse, N.Y., the cost of car rental from Syracuse to Princeton, N.J., and room and board for a two-night stay while in Princeton. No where is

there any indication of what expenses were actually incurred in connection with the New York City meeting, or any basis upon which the court can make an informed allocation. Royal's application is therefore denied.

### F. *The Brener Application*

■ The law firm of Brener, Wallach & Hill ("Brener"), attorneys for Royal, submitted an application requesting $15,581.25 in compensation and $263.72 for reimbursement of expenses for what it asserts amounted to a substantial contribution to the case. However, Brener merely states, in general terms, that it "participated actively" in creditors' committee meetings and in other activities necessary to the preservation of the estate. This court finds such assertion patently insufficient to establish a substantial contribution, and Brener's application for attorney's fees and reimbursement of expenses is therefore denied.

### CONCLUSION

Based on the foregoing, it is hereby

ORDERED, that the following sums shall be payable forthwith by the debtors:

| Payee | Total Compensation Including Expenses | Less Interim Award | Amount Payable |
|---|---|---|---|
| Otterbourg | $306,334.68 | $169,750.00 | $136,584.68 |
| Main Hurdman | 297,803.00 | 278,073.00 | 19,730.00 |
| Stryker | 6,010.37 | 0 | 6,010.37 |
| Proskauer | 515,450.06 | 153,389.24 | 362,068.82 |
| L&W&C | 381,279.44 | 83,500.00 | 297,779.44 |
| Ernst & Whinney | 120,475.35 | 118,475.35 | 2,000.00 |
| Crown | 1,239.13 | 0 | 1,239.13 |
| Sun | 900.00 | 0 | 900.00 |
| Fried, Frank | 20,000.00 | 0 | 20,000.00 |
| Milgram | 0 | 0 | 0 |
| Royal | 0 | 0 | 0 |
| Brener | 0 | 0 | 0 |